UNITED STATES of America,
Plaintiff-Appellant,

v.

L.J. GARNER and Tommie N. Garner,
Defendants-Appellees.

No. 83–4531.

United States Court of Appeals,
Fifth Circuit.

July 19, 1985.

Glen H. Davidson, U.S. Atty., Oxford, Miss., Robert S. Greenspan, Susan Sleater, Peter R. Maier, Dept. of Justice, Civ. Div., Washington, D.C., for plaintiff-appellant.

Isaiah Madison, Greenville, Miss., Ben T. Cole, II, Oxford, Miss., for defendants-appellees.

National Housing Law Project, David Madway, Gideon Anders, Berkeley, Cal., for amicus curiae.

Before WISDOM, RANDALL and JOLLY, Circuit Judges.

RANDALL, Circuit Judge:

This case involves the validity of a rule promulgated by the Secretary of Agriculture precluding the Farmers Home Administration from refinancing its own loans. The government brought this action against L.J. and Tommie N. Garner[1] for foreclosure and possession of their residential property following their default on a loan obtained from the Farmers Home Administration. At trial, the Garners claimed that they were entitled to have their loan considered for refinancing and that, until this was done, foreclosure could not occur. The district court agreed, holding that the rule prohibiting the refinancing of Farmers Home Administration loans was not reasonably adopted and was contrary to the congressional statute under which it was promulgated. Accordingly, the court barred the government from proceeding with foreclosure until (1) the Secretary of Agriculture issued regulations providing for refinancing by the Farmers Home Administration of its own loans to qualified debtors and (2) the Farmers Home Administration considered whether its mortgage loan to the Garners qualified for refinancing under those regulations.

On appeal, the government argues that Congress had no intention of compelling the Farmers Home Administration to refinance its own loans. At most, the government argues, Congress intended to give the Secretary of Agriculture broad discretion in determining eligibility requirements for refinancing. We agree with the government that the Farmers Home Administration is not obligated by statute to refinance its own loans. However, because the Secretary of Agriculture has failed to present an adequate basis and explanation for treating Farmers Home Administration loans differently from other loans, we are unable to conclude that the regulation is the product of reasoned decisionmaking. We, therefore, hold that the challenged

regulation cannot survive judicial scrutiny and affirm in part and remand.

## I. BACKGROUND.

### A. Statutory and Regulatory Framework.

A brief review of the rural assistance housing program, under which the Garners' loan was made, is necessary to set the stage for our analysis. Title V of the Housing Act of 1949, §§ 501–502, as amended, authorizes the Secretary of Agriculture ("Secretary"), through the Farmers Home Administration ("FmHA"), to make direct loans to very low-, low-, and moderate-income rural residents for the purchase, construction, rehabilitation, or refinancing of decent, safe, and sanitary housing. 42 U.S.C. §§ 1471–1472. The express purpose of the Act is to promote "the realization as soon as feasible of the goal of a decent home and suitable living environment for every American family." *Id.* § 1441. To qualify for section 502 financing, an applicant must receive as income an amount not in excess of FmHA limits and be unable to obtain credit from other sources on reasonable terms. *Id.* § 1471(c).

Under current regulations promulgated by the Secretary, "income" is defined as current monthly income received by the applicant and all adult members of the household times twelve. 7 C.F.R. § 1944.-2(c).[2] Pensions, social security, welfare, unemployment benefits, and child support payments are considered income for this purpose. *Id.* § 1944.8(c)(4). Presently, in the Garners' region of the country, a moderate-income person is an individual with a maximum annual family income of $17,000; a low-income person is an individual with a maximum annual family income of $11,500; and a very-low-income person is an individual with a maximum annual family income of $5,300. 7 C.F.R. § 1944, Sub. A, Exh. C. Prior to 1983, at least 60% of the FmHA loans had to be made to persons with low

---

**1.** L.J. Garner died on June 6, 1982, after this action was filed. Nonetheless, this opinion refers to the Garners in the plural to be consistent with prior opinions.

**2.** FmHA regulations have been amended frequently over the last few years. Unless otherwise indicated, any citation is to the current regulation.

incomes. 42 U.S.C. § 1487(*o*)(1) (1980 & Supp.1983). As of 1983, at least 40% of all FmHA loans had to be made to persons of very low income. 42 U.S.C. § 1472(d)(1).

Although a form of social welfare legislation, the section 502 loan program is also a legislative response to the legitimate credit needs of rural residents subject to the vicissitudes of an agrarian economy. *Cf. Curry v. Block*, 541 F.Supp. 506, 513–14 (S.D.Ga.1982) (holding that the 7 U.S.C. § 1981a loan program is a unique mixture of social welfare legislation and legislation designed to supplement business needs of high-risk farmers), *aff'd*, 738 F.2d 1556 (11th Cir.1984). Hence, before extending financing, the FmHA must find that an applicant "has the ability to repay in full the sum to be loaned, with interest." 42 U.S.C. § 1472(a). A qualified borrower usually can receive a loan in the amount equal to the purchase price of the home, 7 C.F.R. § 1944.17(a), and for a term up to thirty-three years.[3] *Id.* § 1944.25(c). The interest rate of the loan is based on the cost of the funds to the government. 42 U.S.C. § 1490a(a)(1)(A). The mortgage note is standardized and includes many of the covenants usually in a commercial mortgage. *See* 7 C.F.R. §§ 1807, 1944.-33(c).

Because low-income borrowers in an agrarian economy often experience financial difficulties in making their monthly loan payments, whether to the FmHA or some other lender, Congress has provided the FmHA with three financial tools to aid distressed borrowers. The first tool, interest credits, is available only to FmHA borrowers and is a need-based subsidy that reduces the effective interest rate on a section 502 loan from the FmHA market rate to a rate as low as 1%. 7 C.F.R. § 1944.34(d). In order to receive interest credits at the closing of a loan, a borrower must have (1) annual income that does not exceed the applicable low-income limit and (2) a net worth under $7,500 (unless an exception is authorized). *Id.* § 1944.-34(f)(1). Interest credits are also available on an existing loan if (1) the above two requirements are met, (2) the loan was originally approved as a low- or moderate-income section 502 loan, and (3) the FmHA determines that interest credits are needed to enable the borrower to repay the loan. *Id.* § 1944.34(f)(5).

The amount of interest credits for which a borrower qualifies is determined by a formula designed to provide the borrower with a subsidy sufficient to meet his needs up to the limits of the program. Simply stated, the qualified borrower is entitled to a reduction of his loan payments to the greater of (1) 20% of the family's adjusted income (which satisfies taxes and insurance charges) or (2) the amount necessary to amortize the loan over its term at a 1% interest rate plus taxes and insurance charges. *Id.* § 1944.34(d). Thus, an FmHA borrower who is confronted with a loss of income can obtain relief by virtue of the interest credit program if he satisfies its threshold eligibility requirements and, prior to the loss of income, was not already receiving interest credits sufficient to reduce his real interest rate to 1%.

The second financing tool entrusted to the Secretary—moratorium relief—also is available solely to FmHA borrowers. To be eligible for a moratorium, a borrower must (1) already be receiving all the interest credit authorized, *id.* § 1951.-313(b)(2)(ii)(B), and (2) demonstrate that, due to circumstances beyond his control, he is unable to make scheduled payments without unduly impairing his standard of living. *Id.* § 1951.313. Moreover, a borrower may only obtain a moratorium if his shelter costs exceed 35% of adjusted income, *id.* § 1951.313(a)(2)(i), and he has not been granted a moratorium within the last five years, *id.* § 1951.313(b)(5). A moratorium permits a borrower who has sustained either a sudden reduction of income or an exceptional increase in essential family ex-

---

**3.** In 1983, Congress amended § 502 of the Housing Act of 1949 to authorize the Secretary to extend the loan amortization period five additional years under certain prescribed conditions. *See* Rural Housing Amendment of 1983, Pub.L. No. 98–181, 97 Stat. 1241 (1983).

penses to suspend payment for a six-month period. *Id.* § 1951.313(b)(4). If the borrower remains eligible, the moratorium may be renewed for additional six-month periods up to a total of three years. *Id.* § 1951.313(b)(5). Interest continues to accrue during the moratorium period, usually at a 1% rate.[4]

At the end of a moratorium, a borrower may be treated in one of several ways. When a borrower's income level is at sufficiently high levels, the FmHA requires him to pay over the next two years the amount of principal and interest deferred over the moratorium period in addition to his regularly scheduled loan installments. *Id.* § 1951.313(e)(1)(i). Should the borrower's income not be as high, the unpaid principal and interest balance is reamortized over the remaining term of the loan. If necessary, the term of the loan can also be extended by a period not to exceed the length of time that the moratorium was in effect. *Id.* § 1951.313(e)(1)(ii)–(iii). Finally, in cases of extreme hardship, the FmHA can cancel the accrued interest.

The effect of a moratorium is to give the borrower a temporary breathing spell during times of financial hardship. A moratorium is not designed to provide the borrower with long-term relief, such as lower monthly payments. In fact, following a moratorium, payments often increase because accrued interest and possibly the deferred principal are amortized over the loan period. At best, when the loan term is extended by the moratorium period and the accrued interest is cancelled, the amount of future payments remains the same.

Finally, Congress has authorized the FmHA to refinance the indebtedness of those rural homeowners who are in jeopardy of losing their dwellings because of circumstances beyond their control. 42 U.S.C. § 1471(a). Refinancing in this context has the effect of folding the borrower's outstanding debt into the principal of a new loan governed by the same terms and conditions that apply generally to loans extended under the section 502 loan program. Such new loans, for example, currently can have terms of up to thirty-three years and be subsidized under the interest credit program. Unlike moratorium relief, therefore, refinancing, at least under some circumstances, can significantly lower monthly payments by extending the amortization period for repayment of the debt and indirectly reducing the interest rate through the provision of interest credits.

The Secretary has promulgated regulations delineating the conditions under which refinancing is presently available. In relevant part, the regulations provide that refinancing assistance is available when (1) the debt was incurred for an eligible purpose under the section 502 program, *id.* § 1944.22(b)(1); (2) the absence of such assistance is likely to result in the loss of the dwelling, *id.* § 1944.22(b)(4); and (3) the FmHA is not the creditor of the debt to be refinanced, *id.* § 1944.22(a).[5] Thus, as a result of this last eligibility criterion, refinancing can be used as a tool for loan servicing only with respect to non-FmHA borrowers. It is the validity of this regulation, prohibiting the FmHA from refinancing its own loans, that is the central issue presented in this case.

B. Factual and Procedural History.

On March 23, 1978, the FmHA loaned the Garners $24,300 for the purchase of residential property in Hollandale, Mississippi. In connection with the loan, the Garners executed a deed of trust giving the FmHA a security interest in the property and signed a promissory note setting forth the repayment obligation. The note required the Garners to repay the loan in monthly installments over a thirty-three-year period at an annual rate of 8%. Because the Garners were eligible for interest credits, however, the amount of the monthly pay-

---

**4.** The rate is usually 1% because, as noted above, a borrower must already be receiving the full amount of interest credit authorized before moratorium relief can be granted.

**5.** 7 C.F.R. § 1944.22(a) provides that "[r]efinancing of FmHA debts and debts on a building site without a dwelling is not authorized."

ment was set at $175, approximately 20% of the Garners' monthly income and a sum less than the 8% interest rate would require. The note also contained a standard acceleration clause in case of default.

Following the purchase of the property, the Garners became delinquent in their loan payments. By October, 1982, the Garners were in arrears in the amount of $8,575. The FmHA notified the Garners that they were in default and demanded payment. After the Garners failed to cure their default, the government obtained a nonjudicial foreclosure against the property and instituted an eviction action in district court. The district court dismissed the suit and set aside the nonjudicial foreclosure on the ground that the Garners had not waived their right to a judicial hearing prior to foreclosure. The government did not appeal from the district court's judgment.

On July 27, 1981, the government brought the instant action for judicial foreclosure and possession of the Garners' Hollandale property. In December of 1982, while the action was still pending, the Garners requested moratorium assistance from the FmHA. The FmHA denied this request on the ground that, because the Garners' loan payment required less than 35% of their income, they were ineligible for such relief under FmHA regulations. *See* 7 C.F.R. § 1951.313. Although the Garners were apprised of their right to an administrative appeal, none was taken.

Shortly before trial on March 4, 1983, the Garners, pursuant to 42 U.S.C. § 1471(a), asked the FmHA to refinance their loan. The FmHA, relying on the regulation prohibiting it from refinancing its own loans, denied this request as well. *See* 7 C.F.R. § 1944.22(a). At trial, the district court in an informal bench ruling found that the Garners' due process rights had been satisfied with respect to the judicial foreclosure proceeding and that the Garners had waived any right to a moratorium on repay-

ment by failing to appeal the FmHA's denial of their moratorium request. The court thereupon stated that it was prepared to order foreclosure upon being satisfied that the FmHA lacked the authority to refinance the Garners' loan. The court withheld final judgment pending briefing on that issue by the parties.[6]

On July 1, 1983, the district court in a memorandum opinion and order held that the Secretary "may not completely prohibit refinancing of FmHA debts." *United States v. Garner*, 567 F.Supp. 313, 316 (N.D.Miss.1983). The district court found that the inclusion of language "authorizing" the Secretary to refinance indebtedness in section 501 of the Act was not dispositive proof that the refinancing of FmHA loans was a matter that Congress left to the Secretary's discretion. Rather, because of the phrase's ambiguity, the court found it necessary to consider the purposes of the Act and its legislative history in order to ascertain whether the FmHA is obliged to refinance at least some of its own loans.

The district court noted that the statute's primary goal is the provision of decent and safe housing. In reviewing the legislative history of the 1979 amendments to the Act, the court viewed Congress' unqualified repeal of the ban on refinancing any indebtedness incurred within five years as evidence that Congress intended the FmHA to refinance its own loans. Moreover, the district court relied heavily on the texts of the Conference Report and the House Banking Committee Report on the 1979 amendments to the Act as strong indications that Congress expected the FmHA to refinance its own loans when a failure to do so would place a homeowner in jeopardy of losing his home through no fault of his own. Based on the foregoing, the court found that the regulation prohibiting the FmHA from refinancing its own loans was both contrary to statute and not reasonably adopted. *Id.*[7]

6. The parties' briefs to the district court on this issue are not included in the appellate record.

7. The district court stated:

Since it is clear from the legislative history that Congress has imposed an imperative duty, and not an unfettered discretionary

Accordingly, the court barred the FmHA from proceeding with foreclosure until it considered the Garners' loan for refinancing under properly adopted regulations. In the interim, the Garners were required to make payments into the court's registry in the amount of $150 per month as reasonable rent for the property.[8]

On appeal,[9] the government argues that both the plain meaning of the Act and its legislative history clearly reveal that Congress never intended to compel the FmHA to refinance its own loans. In addition, the government asserts that the Secretary's demarcation between FmHA loans and other loans for purposes of refinancing is reasonable and within the broad discretion of the Secretary. Following oral arguments, we raised the additional issue whether, assuming the Secretary did not have a statutory duty to refinance FmHA loans, our ability to evaluate fully the rationality of the measure was frustrated under the circumstances of this case. Specifically, we inquired whether the regulation could be upheld as valid in the absence of a concise general statement of basis and purpose incorporated in the regulation or any explanation at all for the Secretary's promulgation of the regulation other than that offered by appellate counsel. The parties submitted additional briefs on this issue, and their respective positions are fully described below. We consider first, however, the scope of the Secretary's congressional mandate, if any, to provide refinancing.

## II. DISCUSSION.

### A. The Duty to Refinance.

"Where, as here, resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Our inquiry, therefore, begins with the text of the Housing Act of 1949, as amended. We remain mindful, however, that a statute, although seemingly clear at first, often contains latent ambiguities, requiring recourse to other explanatory sources. *See James v. United States*, 760 F.2d 590, 593–94 (5th Cir.1985) (en banc).

In the Housing Act of 1949, Congress declared the following to be national housing policy:

■ governmental assistance to eliminate substandard and other inadequate housing through the clearance of slums and blighted areas, to facilitate community development and redevelopment, and to provide adequate housing for urban and rural nonfarm families with incomes so low that they are not being decently housed in new or existing housing shall be extended to those localities which estimate their own needs and demonstrate that these needs are not being met through reliance solely upon private enterprise, and without such aid; and [2] governmental assistance for decent, safe, and sanitary farm dwellings and related

power, upon the Secretary of Agriculture to allow FmHA refinancing in certain circumstances, the Court finds the regulation codified at 7 C.F.R. § 1944.22(a) (1982) was not reasonably adopted, conflicts with the act of Congress under which it was promulgated, and cannot stand.
567 F.Supp. at 316.

8. The unpublished order provided:
ORDERED:
   1. That plaintiff shall consider the FmHA loan of L.J. and Tommie N. Garner for refinancing under properly adopted regulations containing such conditions as the Secretary of Agriculture shall deem necessary.
   2. That defendants reinstitute payments into the registry of the court in the sum of

$150 per month as reasonable rent for the use of the dwelling until plaintiff considers defendants' loan for refinancing.
On August 15, 1983, the district court, upon the Garners' motion, modified its judgment to reduce their monthly rental payments from $150 per month to $100 per month.

9. We dismissed the government's first appeal of this case for lack of appellate jurisdiction. *United States v. Garner*, 749 F.2d 281 (5th Cir.1985). Thereafter, on our suggestion, the district court reentered its interlocutory order, and this appeal was perfected pursuant to 28 U.S.C. § 1292(b). *See United States v. Garner*, 752 F.2d 116 (5th Cir.1985).

facilities shall be extended where the farm owner demonstrates that he lacks sufficient resources to provide such housing on his own account and is unable to secure necessary credit for such housing from other sources on terms and conditions which he could reasonably be expected to fulfill.

42 U.S.C. § 1441. Toward this end, section 501(a) of the Act, as amended, provides in pertinent part:

The Secretary of Agriculture (hereinafter referred to as the "Secretary") is authorized, subject to the terms and conditions of this subchapter, to extend financial assistance, through the Farmers Home Administration, (1) to owners of farms in the United States ... to enable them to construct, improve, alter, repair, or replace dwellings and other farm buildings on their farms, and to purchase buildings and land constituting a minimum adequate site, in order to provide them, their tenants, lessees, sharecroppers, and laborers with decent, safe, and sanitary living conditions and adequate farm buildings as specified in this subchapter, and (2) to owners of other real estate in rural areas for the construction, improvement, alteration, or repair of dwellings, related facilities, and farm buildings and to rural residents ... for such purposes and for the purchase of buildings and the purchase of land constituting a minimum adequate site, in order to enable them to provide dwellings and related facilities for their own use and buildings adequate for their farming operations, and (3) to elderly or handicapped persons or families who are or will be the owners of land in rural areas for the construction, improvement, alteration, or repair of dwellings and related facilities, the purchase of dwellings and related facilities and the purchase of land constituting a minimum adequate site, in order to provide them with adequate dwellings and related facilities for their own use, and (4) to an owner described in clause (1), (2), or (3) for refinancing indebtedness which—

(A) was incurred for an eligible purpose described in such clause, and

(B)(i) if not refinanced, is likely to result (because of circumstances beyond the control of the applicant) at an early date in the loss of the applicant's necessary dwelling or essential farm service buildings, or

(ii) if combined (in the case of a dwelling that the Secretary finds not to be decent, safe, and sanitary) with a loan for improvement, rehabilitation, or repairs and not refinanced, is likely to result in the applicant's continuing to be deprived of a decent, safe, and sanitary dwelling.

42 U.S.C. § 1471(a). The FmHA is required to exercise these powers "consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective." *Id.* § 1441. Nonetheless, it is clear that the FmHA, while a lender of last resort, is authorized only to extend assistance if the applicant has the ability to repay in full the sum to be loaned. *Id.* § 1472(a). A loan from the FmHA is by no means a grant.

From the text of the Act itself, it is evident that Congress did not expressly distinguish between FmHA borrowers and non-FmHA borrowers for purposes of extending refinancing assistance. It is not clear, however, whether Congress intended to compel the FmHA to provide such assistance or whether refinancing is totally within the guided discretion of the Secretary. Nor can we ascertain from merely the language of the Act whether, if some duty to refinance exists, it would extend to all borrowers that met the threshold eligibility requirements of the statute. The government is correct in pointing out that the word "authorize" generally is given a permissive connotation rather than a mandatory one. *See, e.g., Creek Nation v. United States,* 318 U.S. 629, 639, 63 S.Ct. 784, 789, 87 L.Ed. 1046 (1943); *United States v. Maryland,* 471 F.Supp. 1030, 1038 (D.Md. 1979). This rule, though, is by no means absolute. In establishing a program of

indefinite duration requiring annual appropriations, Congress is more apt to use permissive terms notwithstanding the fact that the duty of the agency to implement the program is clearly mandatory. *See generally Commonwealth of Pennsylvania v. Lynn*, 501 F.2d 848, 854 & n. 21 (D.C.Cir.1974). Indeed, in divining Congress' intent with respect to such programs, the courts have almost uniformly eschewed a mechanical reliance on one or two discretionary terms in an act in favor of a careful examination of the statute as a whole in the light of its purposes and legislative history. *See, e.g., Matzke v. Block*, 732 F.2d 799, 801 (10th Cir.1984); *Commonwealth of Pennsylvania v. Lynn, supra*, at 854; *Curry v. Block, supra*, at 515; *Rocky Ford Housing Authority v. USDA*, 427 F.Supp. 118 (D.D.C.1977); *Pealo v. FmHA*, 361 F.Supp. 1320, 1324 (D.D.C. 1973); *accord*, Statement of William H. Rehnquist, Assist. Atty. Gen., Office of Legal Counsel, in *Hearings on Executive Impoundment of Appropriated Funds*, Before the Subcomm. on Separation of Power of the Senate Comm. on the Judiciary, 92d Cong., 1st Sess. 234 (1971). It is to such an examination that we now turn.

■ As originally enacted, the Housing Act of 1949, Pub.L. No. 81–171, 63 Stat. 432 (1949), was intended to be the "essential first action" toward a comprehensive housing program. The purpose of the section 502 rural housing program in particular was to supplement, on reasonable terms, the credit already available to farmers faced with the uncertainties of agricultural income. S.Rep. No. 84, 81st Cong., 1st Sess., *reprinted in* 1949 U.S.Code Cong. Service 1550, 1552, 1576.[10] Consequently, the authority granted to the Secretary only included the power to extend loans to qualified borrowers and provide moratorium relief when needed.[11] Nothing in the legislative history of the Act, as originally constituted, indicates that Congress ever considered vesting the Secretary with the authority to refinance any loan or, for that matter, to subsidize loan payments.

The Secretary was first given the authority to refinance loans with the passage of the Demonstration Cities and Metropolitan Development Act of 1966, Pub.L. No. 89–754, 80 Stat. 1282 (1966). This Act, in part amending section 501 of the Housing Act, gave the Secretary authority to refinance indebtedness "not held or insured by the United States or any agency thereof." This type of assistance for the first time provided relief to the rural borrower who was able to obtain a loan from private sources but, as a result of a reduction in income or an increase in necessary expenses, was in jeopardy of losing his home. Inexplicably, however, there is no mention of the refinancing provision in the history of the 1966 Act. The measure apparently was added to the bill following the Conference Committee Report and passed without debate.[12]

---

10. The Senate Report explains further:

Housing on the farms of the Nation has on the whole lagged behind the development of adequate, decent, safe, and sanitary dwellings of urban communities. On most farms, the income from farming operations controls the type of dwelling on the farm. The operator of the farm does not have a free choice of dwellings comparable to the worker in the city. The uncertainty of agricultural income, in addition to the other hazards of agricultural production, have prohibited long-time financing of building improvements on many farms. The types and extent of conventional credit which is available to farmers is usually needed in the acquisition or operation of the farm, leaving little or no credit available for the improvement of farm buildings. Neither the insurance of private investments by the Government nor the urban type of public housing assistance will meet the needs of more than a million farm families for adequate, decent, safe, and sanitary housing and other necessary farm buildings. A special type of financial assistance designed specifically to meet the problems of the farmers who cannot get credit elsewhere ... must be undertaken by the Government.

S.Rep. No. 84, 81st Cong., 1st Sess., *reprinted in* 1949 U.S.Code Cong. Service at 1576.

11. The Secretary, however, did not establish the procedures to grant a moratorium until 1974. *See* 7 C.F.R. § 1861.10 (1975).

12. Soon after the passage of the amendments, the Secretary promulgated regulations implementing its limited refinancing authority. *See* 7 C.F.R. § 1822.7(d)(3) (1971).

The first substantive legislative discussion of the FmHA's refinancing program accompanied the Housing and Development Act of 1974, Pub.L. No. 93–383, 88 Stat. 633 (1974) ("1974 Amendments"), which contained further amendments to the Housing Act of 1949.[13] Under these amendments, the prohibition against refinancing government loans was deleted from the Act and replaced with a general provision barring the FmHA only from extending refinancing to any indebtedness incurred within five years prior to the application for assistance. While the House and Conference Reports do little more than track the language of the statute, the Senate Report reveals more fully the objectives of the legislation:

> The Farmers Home Administration already has forebearance authority under section 505 of the Act, which authorizes the Secretary to grant a moratorium on interest and principal for so long as he deems necessary when failure to repay the loan is due to circumstances beyond the control of the borrower. In cases of extreme hardship the Secretary is authorized to cancel interest payments accrued during such moratorium, and he is barred from taking a deficiency judgment in the event of subsequent foreclosure when the borrower has faithfully tried to meet his obligation.
>
> The refinancing authority provided in this bill would give the Secretary an additional means of preventing severe hardship to rural housing borrowers resulting in loss of dwelling, and a means probably less costly to the Federal Government than forebearance. Refinancing to permit rehabilitation or prevent loss of dwelling would appear to be consistent with the Administration's policy of emphasizing use of existing housing to meet the needs of low and moderate income families.
>
> The Committee has been informed that the Secretary has never actually utilized the forebearance authority granted in

present law and in fact has not even issued regulations pursuant to that authority. In view of the pressing need to enable rural · families to acquire and maintain adequate housing, the Committee urges the Secretary to utilize existing authority as well as the new authority granted in this bill to enable rural housing borrowers to keep their homes in cases of financial hardship.

> In addition, the Committee notes that the refinancing authority provided under this section is discretionary with the Secretary. Nothing in the statutory language requires FmHA to refinance bad debts or to bail out other creditors. The Secretary is urged to develop guidelines and criteria for making full use of this authority consistent with the need for sound administration of FmHA housing programs.

S.Rep. No. 693, 93d Cong., 2d Sess. 65, *reprinted in* 1974 U.S. Code Cong. & Ad. News 4273, 4334.

From this language, several things are apparent. First, the refinancing authority was meant to complement, rather than duplicate, moratorium relief. The Senate Report quite clearly contemplated that the FmHA would use refinancing in addition to moratoria and probably at less cost to the government. Second, it follows from this that the Secretary's refinancing power included the authority to refinance FmHA loans. Certainly, if the effect of refinancing is to reduce the cost of servicing loans, refinancing must be used in lieu of moratorium relief under circumstances where such relief would otherwise be available. Finally, it is clear that the Secretary was given at least some discretion in implementing its refinancing authority. For example, the FmHA was not obligated to make bad loans or bail out creditors. The limits of this discretion, however, remain murky. While the Report stressed the need to provide increased assistance to rural homeowners, it only "urged" the Secre-

---

**13.** Between the 1966 and 1974 Amendments, Congress passed the Housing and Urban Development Act of 1968, Pub.L. No. 90–448, 82 Stat. 551 (1968). This Act added the interest credit program to the Secretary's loan authority. *See generally Pealo v. FmHA, supra,* at 1321–22.

tary to utilize new as well as existing authority. Similarly, the Report only "urged" the Secretary to exercise its discretion "consistent with the need for sound administration of FmHA housing programs." This language is ambivalent at best and cannot serve as the basis of a finding that the Secretary has an imperative duty to allow the FmHA to refinance its own loans. We therefore agree with the government that, although the Report clearly sets forth the hopes of the committee on the matter, "the 1974 amendments only gave [the] FmHA discretion to refinance its own loans." Appellant's Reply Brief at 8.

The most recent amendments to the section 502 rural loan program that we need consider were passed as part of the Housing and Community Development Amendments of 1979, Pub.L. No. 96–153, 93 Stat. 1101 (1979) ("1979 Amendments").[14] These amendments removed the five-year restriction to permit refinancing without regard to length of time the house was owned. Drawing upon the various committee reports on these amendments, both the Garners and the government find support for their respective positions.

The Garners, echoing the district court, contend that Congress in passing the 1979 Amendments intended to impose a mandatory duty on the FmHA to refinance its own loans. In support of this claim, the Garners point to the Conference Report, which reads in pertinent part:

The conferees, in approving the new refinancing authority, expect the Secretary to use the authority to assist rural home owners threatened with the loss of their homes or continuing housing deprivation under certain circumstances. At the same time, the conferees desire the Secretary to use the new authority prudently and in a manner that does not encourage borrowers to relax in managing their finances and fully meeting their loan obligations.

The conferees intend that the Secretary should provide applicants refinancing assistance where, because of illness, loss of employment or income resulting from a local or national economic downturn, or such other similar events or unforeseen circumstances, the applicant might lose the dwelling.

The conferees also expect the Secretary not to deny refinancing assistance to an applicant because his or her dwelling is not found to be dilapidated or uninhabitable. A deteriorating dwelling with major deficiencies in decent, safe and sanitary standards should, if otherwise eligible, be permitted to be refinanced.

Conf.Rep. No. 706, 96th Cong., 1st Sess. 96, *reprinted in* 1979 U.S.Code Cong. & Ad. News 2317, 2455.[15]

The language used in the above excerpt is more compulsory than that found in the Senate Report on the 1974 Amendments. Based on both these reports, we think it is evident that, at least by 1979, Congress intended refinancing to be allowed at least in some instances. However, we do not read the language in either report as spe-

---

**14.** The Housing Act of 1949 has been amended since 1979, although these amendments are not directly pertinent to this appeal. *See, e.g.,* Rural Housing Amendment of 1983, Pub.L. No. 98–181, 97 Stat. 1241 (1983); *supra* note 4.

**15.** The Garners also rely on the House Report, which provides:

The Committee has made several important changes in FmHA's refinancing authority. These changes have been made with considerable trepidation. With limited funds to meet the housing needs of rural families, the Committee does not desire that refinancing be indiscriminately permitted. Nor does the Committee intend that refinancing should result in encouraging or "bailing out" individuals or firms that overburden rural families with debt obligations. However, when through no fault of their own, rural homeowners stand to lose their homes, and in turn, would be forced to occupy substandard housing, the Committee believes that FmHA should permit such owners to refinance their homes. The Committee recognizes that this places a difficult burden on FmHA and urges that it implement the new refinancing provisions cautiously.

H.R.Rep. No. 154, 96th Cong., 1st Sess. 44, *reprinted in* 1979 U.S.Code Cong. & Ad.News 2317, 2360.

cifically mandating that the Secretary permit the FmHA to refinance its own loans. Rather, it seems reasonably clear that Congress granted the Secretary discretion in implementing its refinancing authority, although that discretion of course was intended to be exercised "prudently" in accordance with the policies of the Act.

For similar reasons, we also cannot accept the government's contention that the congressional intent behind the 1979 Amendments was to deprive the FmHA of even the option to refinance its own loans. In asserting this position, the government relies upon the following language from the Senate Report:

> Section 3 of the bill *would authorize FmHA to refinance a non-FmHA mortgage* on a house owned less than 5 years, when the owner faces foreclosure or hardship. Under existing law, FmHA is prohibited from helping rural homeowners who have purchased their homes within 5 years of their request for financial help, even though credit may not be available from other sources. The committee believes that the prohibition, which was enacted in order to insulate FmHA from possible abuses arising from the sale of homes with commercial rather than mortgage loans, is too restrictive. Accordingly, it recommends repeal of the prohibition at this time.

S.Rep. No. 157, 96th Cong., 1st Sess. 3 (1979) (emphasis added).[16]

The off-handed reference to the FmHA's refinancing authority as extending to "non-FmHA" loans is hardly sufficient to compel the conclusion that Congress in enacting the 1979 Amendments intended to create or even approve of a bar against the refinancing of FmHA loans. The restriction is not mentioned in any of the other committee reports and played no part in the floor debates on the 1979 Amendments. We find it inconceivable that such a substantive restriction on the power of the Secretary would receive not even summary treatment in any of these other traditional sources of

legislative history and intent. As we discuss *infra*, the government contends that the FmHA in practice did not refinance its own loans between 1974 and 1979. We can only regard the above passage as a reflection of that practice that inexplicably made its way to the text of the Senate Report.

In sum, we find that, under the Housing Act of 1949, as amended, the Secretary has the duty to implement a refinancing program of some description. This duty, however, does not require the refinancing of FmHA loans, at least as a matter of statutory law. We further find that, in exercising its refinancing authority, the Secretary does not enjoy unfettered discretion. Rather, it is incumbent upon the Secretary to institute a refinancing program that serves the objective of the section 502 loan program: providing needed financial support to rural home owners threatened with the loss of their homes "in a manner that does not encourage borrowers to relax in managing their finances and fully meeting their loan obligations." Conf.Rep. No. 706, 96th Cong., 1st Sess. 96, *reprinted in* 1979 U.S. Code Cong. & Ad.News at 2455.

Because we hold that the regulation prohibiting the FmHA from refinancing its own loans is not contrary to statute, it remains for us to determine whether the regulation was rationally adopted under the appropriate standard of review.

## B. "Arbitrary and Capricious."

■ The Housing Act of 1949 itself does not set forth the standard of review governing our consideration of the regulations promulgated by the Secretary thereunder. We consequently apply the general standard for reviewing administrative actions provided in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. *See, e.g., Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir.1983); *Save the Bay, Inc. v. Administrator of the EPA,* 556 F.2d 1282 (5th Cir.1977). Under this standard, agency action may only be set aside if it is "arbitrary, capricious, an

---

**16.** This Senate Report is not reprinted in the U.S.Code Congressional and Administrative

News and apparently did not come to the district court's attention.

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[17]

In determining whether administrative action is arbitrary and capricious, we must accord the agency's decision a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Moreover, we are prohibited from substituting our judgment for that of the agency. *Id.* Nonetheless, while the arbitrary and capricious standard of review is highly deferential, it is by no means a rubber stamp. The Supreme Court has recently reaffirmed that an agency is charged with the duty of examining the relevant data and articulating a satisfactory explanation for its action, including a " 'rational connection between the facts found and the choice made.' " *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). Judicial review of an agency's decision consists of determining " 'whether [that] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)

(quoting *Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. at 824); *Louisiana Environmental Society, Inc. v. Dole,* 707 F.2d 116, 119 (5th Cir.1983). Thus, an administrative rule or regulation is arbitrary and capricious when

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n, supra,* 463 U.S. at 43, 103 S.Ct. at 2867. In other words, the essential function of judicial review, in this context, is to ensure that the agency engaged in "reasoned decision-making." *International Brotherhood of Teamsters v. United States,* 735 F.2d 1525, 1531 (D.C.Cir.1984); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); *City of Houston v. FAA,* 679 F.2d 1184, 1190 (5th Cir.1982).

■ Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's "decisionmaking," rather than its actual decision, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis

---

**17.** 5 U.S.C. § 706 provides in pertinent part:
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \* \* \* \*

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

Section 701(a) states that § 706 does not apply when (1) a statute precludes judicial review or (2) agency action is committed to agency discretion by law. 5 U.S.C. § 701(a). None of the parties argues, nor do we think, that either of these exceptions applies. In view of the statutory directive that the FmHA shall "exercise [its] powers, functions, or duties ... consistently with the national housing policy," 42 U.S.C. § 1441, and the additional guidelines for the exercise of discretion provided in the legislative history of the Act, *see supra,* it cannot be said that "the statute in question is drawn in such broad terms that in a given case there is no law to apply." *Suntex Dairy v. Block,* 666 F.2d 158, 164 (5th Cir.) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)), *cert. denied,* 459 U.S. 826, 103 S.Ct. 59, 74 L.Ed.2d 62 (1982).

articulated by the agency itself." *Motor Vehicle Manufacturers Ass'n, supra,* 463 U.S. at 50, 103 S.Ct. at 2870; *see also American Textile Manufacturers Institute v. Donovan,* 452 U.S. 490, 539, 101 S.Ct. 2478, 2505, 69 L.Ed.2d 185 (1981); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Post hoc explanations—especially those offered by appellate counsel—are simply an inadequate basis for the exercise of substantive review of an administrative decision. *Burlington Truck Lines, supra,* 371 U.S. at 168, 83 S.Ct. at 245; *Baylor University Medical Center v. Heckler,* 758 F.2d 1052, 1060 (5th Cir.1985); *Global Van Lines, Inc. v. ICC,* 714 F.2d 1290, 1299 n. 8 (5th Cir.1983). Partly in order to provide courts with a foundation for judicial review, the APA requires rules that are the product of informal rulemaking to include within themselves "a concise general statement of their basis and purpose." [18] 5 U.S.C. § 553(c); *Baylor University Medical Center, supra,* at 1060; *Petry v. Block,* 737 F.2d 1193, 1198 (D.C.Cir.1984); *Amoco Oil Co. v. EPA,* 501 F.2d 722, 739 (D.C.Cir. 1974). Although the specificity of such a statement may vary with the rule, it must usually at least contain sufficient information to allow a court to exercise judicial review—that is, an explanation " 'of the complete factual and legal basis as well as the real object or objects sought.' " *Global Van Lines, Inc. v. ICC,* 714 F.2d 1290, 1298 (5th Cir.1983) (quoting Senate Judiciary Committee Print of June, 1945, *reprinted in Administrative Procedure Act: Legislative History,* S.Doc. No. 248, 79th Cong., 2d Sess. 20 (1946)); *see also Kollett v. Harris,* 619 F.2d 134, 140 (1st Cir.1980).[19]

An agency's failure to present an adequate explanation with respect to one of its rules has frequently resulted in that rule's invalidation on the ground of being arbitrary and capricious, violative of the procedural requirements of the APA, or both. *See, e.g., International Brotherhood of Teamsters v. United States, supra,* at 1532 (arbitrary and capricious); *International Ladies' Garment Workers' Union v. Donovan, supra,* at 815 n. 35 (both); *Global Van Lines, Inc. v. ICC, supra,* at 1298–99 (violative of section 553); *Action on Smoking and Health v. CAB,* 699 F.2d 1209, 1217 (D.C.Cir.1983) (both); *United States v. Nova Scotia Food Prod-*

**18.** 5 U.S.C. § 553 reads in part:
(a) This section applies, according to the provisions thereof, except to the extent that there is involved—
(1) a military or foreign affairs function of the United States; or
(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.
(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
(1) a statement of the time, place, and nature of public rule making proceedings;
(2) reference to the legal authority under which the rule is proposed; and
(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
Except when notice or hearing is required by statute, this subsection does not apply—
(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.
(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

**19.** This is not to say that the requirements of a cogent explanation under § 553 and under the arbitrary and capricious standard of § 706(2)(A) are necessarily coextensive. Under the facts of the present case, we need not reach the question whether a statement may satisfy the prerequisites of § 553 but still be incomplete with respect to the threshold explanatory prerequisite of § 706.

*ucts Corp.*, 568 F.2d 240, 252–53 (2d Cir. 1977) (both); *Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092, 1099 (5th Cir.1976) (violative of section 553); *Pennzoil Co. v. Federal Power Comm'n*, 534 F.2d 627, 632 (5th Cir.1976) (arbitrary and capricious); *Rodway v. USDA*, 514 F.2d 809, 817 (D.C. Cir.1975) (violative of section 553). Moreover, even when the APA does not require the agency to incorporate in the rule a general concise statement of its basis and purpose, the agency's failure to demonstrate that the rule is the product of reasoned decisionmaking renders it invalid under the arbitrary and capricious standard. *See Overton Park, supra*, 401 U.S. at 419–20, 91 S.Ct. at 825–26.[20] However, in either case, a decision based on an administrative record of less than ideal clarity will be upheld if the agency's path may reasonably be discerned. *Motor Vehicle Manufacturers Ass'n, supra*, 463 U.S. at 43, 103 S.Ct. at 2867; *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra*, 419 U.S. at 286, 95 S.Ct. at 442; *Alabama Ass'n of Insurance Agents v. Board of Governors*, 533 F.2d 224, 237

(5th Cir.1976), *vacated in part on other grounds*, 558 F.2d 729 (5 Cir.1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978).

In the instant case, the challenged regulation—7 C.F.R. § 1944.22(a), prohibiting the FmHA from refinancing its own loans—was promulgated pursuant to section 553 notice-and-comment rulemaking procedures as part of a major overhaul of the FmHA's rural housing loan program regulations.[21] *See* 45 Fed.Reg. 10,240 (1980). In neither the proposed rule nor the final rule, however, did the Secretary set forth a concise general statement of the regulation's basis and purpose. *See id.;* 46 Fed.Reg. 4681 (1981). Rather, the government, in support of its position that the regulation at issue is not arbitrary, capricious, or an abuse of discretion, offers us only post hoc rationalizations for the Secretary's actions. *See, e.g.,* Appellant's Brief at 36–38. Because the district court did not consider the effect that the absence of a contemporaneous basis and purpose statement would have on the validity of the regulation,[22] we requested further briefs

20. The disposition of a case by an appellate court, though, differs depending on whether the agency is obligated to explain the basis of its decision contemporaneously with the promulgation of the rule. When an agency has such a duty, failure to present a satisfactory explanation will result in the vacation of the rule and usually a remand to the Secretary. *See, e.g., Motor Vehicle Manufacturers Ass'n, supra*, 463 U.S. at 57, 103 S.Ct. at 2874; *Tabor v. Joint Board for the Enrollment of Actuaries*, 566 F.2d 705, 712 (D.C.Cir.1977). Of course, when the breach of an agency's duty to provide a reasoned explanation is used defensively, such as in an enforcement action, a court will merely hold a rule invalid and dismiss the complaint. *See United States v. Nova Scotia Food Products Corp., supra*, at 253. However, in those cases where the agency has no obligation to explain the basis of its decision, appellate courts will not invalidate the rule but will allow the agency to submit affidavits along with other extraneous evidence to the district court to explain the basis of the rule or regulation. *Overton Park, supra*, 401 U.S. at 419–420, 91 S.Ct. at 825–826; *Aguayo v. Richardson*, 473 F.2d 1090, 1103 (2d Cir. 1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974). Presumably, this distinction results from the inability of a reviewing court to impose additional procedural require-

ments upon an agency. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

21. Strictly speaking, the regulation at issue is exempt from the rulemaking requirements of the APA under 5 U.S.C. § 553(a)(2). *See supra* note 18; *Baylor University Medical Center, supra*, at 1058–61. The Department of Agriculture, however, has promulgated a regulation making the procedural requirements of § 553 applicable in this context. *See* 36 Fed.Reg. 13,-804 (1971). It is well recognized that this regulation has the force and effect of law. *See Curry v. Block*, 738 F.2d 1556, 1564 (11th Cir.1984); *Arlington Oil Mills, Inc. v. Knebel, supra*, at 1095 n. 6; *Rodway v. USDA, supra*, at 814.

22. The failure of the parties to raise the issue of the regulation's procedural validity under 5 U.S.C. § 553(c) would ordinarily preclude us from considering it on appeal. We do so here because a determination whether the regulation is arbitrary and capricious requires us to consider in support of the regulation only explanations articulated by the agency itself, preferably those issued contemporaneously with the rule's promulgation. *Motor Vehicle Manufacturers Ass'n, supra*, 463 U.S. at 50, 103 S.Ct. at 2870 ("The short—and sufficient—answer to petition-

on the subject. The government in response asserted a number of arguments for upholding the regulation irrespective of the apparent lack of cogent explanations by the Secretary. We consider—and reject—these arguments below.

### 1. *Concise General Statement of Basis and Purpose.*

With respect to section 553(c), the government argues that the Secretary did not have a duty to incorporate in the rule prohibiting the FmHA from refinancing its own loans a concise general statement of its basis and purpose or, if he did, the statement provided was sufficient. Specifically, the government contends that (1) such a statement was not required because the regulation was not a "major" revision; (2) the statement that was issued pertaining to the regulation eliminating the ban against refinancing loans less than five years old was sufficient to satisfy the mandate of section 553 with respect to the regulation at issue; and (3) because the regulation did not change prior policy, the Secretary was not obliged to publish a statement of its basis and purpose. As the government concedes, the rationale behind all three of these arguments is the same: that the 1981 regulation in question did not alter pre-existing FmHA policy and practice and therefore a separate and distinct statement of basis and purpose for that regulation was not required. This logic, however, even if valid, is ultimately unavailing; the government's arguments simply do not go far enough to save the regulation.

We assume *arguendo* that the government is correct in asserting that a regulation merely reaffirming prior policy and practice need not conform strictly to section 553(c)'s requirement of a basis and purpose statement. Nonetheless, the government cannot have its proverbial cake and eat it too. If the 1981 regulation is to be exempt from the requirements of section 553(c) because it does nothing more than clarify and restate well-established policy, that policy must have been previously adopted fully in accordance with the procedures of the APA. Otherwise, an agency that wished to forego compliance with section 553(c) could simply do so and, if not challenged in time, issue a "clarifying" regulation invulnerable to attack on section 553(c) grounds. *Cf. United States Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir.1979) (holding that post-promulgation comments do not satisfy mandate of section 553 because "[a]n agency that wished to dispense with pre-promulgation notice and comment could simply do so, invite post-promulgation comment, and republish the regulation before a reviewing court could act."). The directives of the APA are not so easily avoided.

In the case at hand, the government asserts that it promulgated a regulation preventing the refinancing of FmHA loans in 1974 as part of its regulatory response to the 1974 Amendments to the Housing Act of 1949. The pertinent regulation reads as follows:

Loans ordinarily will not be made to refinance long-term real estate loans guaranteed or insured by the Federal Housing Administration (FHA) or the Veterans Administration (VA) or of the type generally made by lenders such as the Federal Land Banks (FLB) or insurance companies. When it is necessary to refinance such debts, the total debt will

ers' submission is that the courts may not accept appellate counsel's *post hoc* rationalizations for agency action); *cf. P.A.M. News Corp. v. Hardin*, 440 F.2d 255, 258 (D.C.Cir.1971). Indeed, as noted above, the purpose of the basis and purpose statement of § 553(c) is to ensure that a reviewing court has a sufficient foundation upon which to exercise judicial review. Moreover, because we hold that the Secretary has failed to explain adequately the rationale behind the challenged regulation, we must consider the

applicability of § 553(c) to the regulation in order to frame the appropriate remedy. *See supra* note 20. Finally, we note that, in response to our request for additional briefings, neither party objected to our consideration of this issue. The government, in fact, agreed that "whether the FmHA's adoption of the challenged rule met the APA's procedural requirements is inextricably intertwined with the merits of this appeal." Appellant's Letter Brief of June 12, 1985, at 1.

not be refinanced if a part of the debt can be refinanced on a sound basis with the lender's agreement. In such a case, that part of the debt to be refinanced will not include more than existing delinquencies plus the next installment to become due that the borrower will be unable to pay.

7 C.F.R. § 1822.7(3) (1975). Pretermitting the not insubstantial question of whether this regulation actually served to prohibit the FmHA from refinancing its own loans, we find that, to the extent it did preclude such refinancing, the regulation was not promulgated in accordance with the mandate of section 553(c).

■ It is evident that the 1974 regulations were published without opportunity for prior comment and without a general concise statement of basis and purpose. *See* 39 Fed.Reg. 44,992, 44,993 (1974). The Secretary justified noncompliance with section 553(c) in the regulation itself by invoking the good cause exception of section 553(b)(B). According to this provision, notice and public procedures need not be followed when an agency finds that they are impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. § 553(b)(B).[23] It is well established, however, that this exception is to be read narrowly in order to avoid providing agencies with an "escape clause" from the requirements Congress prescribed. *Petry v. Block, supra,* at 1200; *United States Steel Corp., supra,* at 214; *see generally* Jordan, *The Administrative Procedure Act's "Good Cause" Exception,* 36 Admin.L.Rev. 113, 119 (1984). Moreover, an agency invoking the good cause exception must "incorporate[ ] the finding and a brief statement of reasons therefor in the rules issued." 5 U.S.C. § 553(b)(B).

The explanation provided in the 1974 rules states that the "changes made will enable the agency to expedite needed benefits of the Act to the public and to delay issuance of such regulations by publishing for public comment would be contrary to the public interest." 39 Fed.Reg. at 44,993.[24]

We need not consider whether the Secretary's reasons for invoking the good cause exception warranted the immediate promulgation of the vast number of the 1974 regulations. Irrespective of how adequate this explanation is to justify application of the good cause exception to the rules *implementing* the loan program and the 1974 Amendments, we do not see how this explanation is relevant with respect to the Secretary's policy *denying* refinancing to FmHA borrowers. The urgent need to extend some refinancing assistance to the public simply does not justify issuing regulations, discretionary with the Secretary, cutting off refinancing assistance to a whole class of borrowers on a permanent basis without first giving the public the least notice and an opportunity to comment. This of course is not to say that the FmHA was obliged to extend refinancing to FmHA borrowers while notice and comment procedures were being implemented. However, we will not allow a regulation otherwise subject to section 553 procedures to piggyback on regulations properly issued in response to a sudden exigency when to do so would result in that regulation's being "chiseled into bureaucratic stone." *American Federation of Government Employees v. Block,* 655 F.2d 1153, 1157 (D.C.Cir.1981) (regulations responding to much more than emergency must be promulgated through public procedures); *see also American Transfer & Storage Co. v. ICC,* 719 F.2d 1283, 1293–

---

**23.** For the text of § 553(b)(B), see *supra* note 18.

**24.** In addition to asserting that delay would be "contrary to the public interest," the Secretary stated that compliance with notice and comment procedures with respect to certain, although unspecified, regulations would be "unnecessary" since they merely implement the provisions of the 1974 Amendments. 39 Fed. Reg. at 44,993. As our discussion of the 1974

Amendments reveals, however, Congress did not intend to prevent the FmHA from refinancing its own loans. Rather, the Secretary was given limited discretion to establish the criteria for refinancing. The exercise of this discretion, at least in prohibiting the FmHA from refinancing its own loans, went beyond the mere technical implementation of a statute that makes notice and comment procedures unnecessary. *See* Jordan, *supra,* at 129–35 (collecting cases).

94 (5th Cir.1983) (relying on interim nature of rules in finding that good cause exception was applicable); *National Federation of Federal Employees v. Devine*, 671 F.2d 607, 612 (D.C.Cir.1982) ("limited scope of the agency's emergency order influences our finding that OPM had good cause to dispense with prior notice and comment").

■ In short, we hold that, at least to the extent the 1981 regulation instituted new policy, the Secretary has failed to comply with the procedures required by section 553(c) of the APA. Moreover, assuming *arguendo* that section 553(c)'s requirement of a general concise statement of basis and purpose was inapplicable or less applicable because the 1981 regulation was merely clarifying past policy, we conclude again that the mandate of the APA was not followed. The Secretary in promulgating the 1974 regulation—allegedly establishing the challenged policy for the first time—lacked the good cause necessary to preclude, on a permanent basis and without complying with section 553(c) procedures, FmHA borrowers from receiving refinancing assistance. The good cause exception of section 553(b)(B) is designed to provide agencies with a safety valve when delay would do real harm; it does not extend to agencies the same prerogative of silence usually reserved to legislatures. *See United States v. Nova Scotia Food Products Corp., supra*, at 252.

### 2. *Reasoned Decisionmaking.*

■ The government's final argument is that the regulation preventing the FmHA from refinancing its own loans must be upheld because the Secretary's path in promulgating the regulation may reasonably be discerned. As noted above, it is well established that, when an agency's reasons for promulgating a regulation are apparent, a reviewing court should ordinarily uphold the regulation even in the absence of a contemporaneous explanation issued by the agency. *Motor Vehicle Manufacturers Ass'n, supra*, 463 U.S. at 43, 103 S.Ct. at 2867; *Alabama Association of Insurance Agents, supra*, at 236–37. In

determining whether such a course is appropriate here, we must look to the regulation, the underlying statute and its legislative history, and "extraneous material which may be available to explain the basis and purpose of the agency action." *Id.* at 237.

■ This is not a case in which the agency's path can be discerned. First, the legislative history of the Housing Act of 1949, as amended, instead of supporting the rationality of the regulation, evidences against it. We have already discovered that, in enacting the section 502 loan program and its amendments, Congress generally intended the Secretary to exercise his refinancing authority in accordance with the goals of national housing policy as defined in the Act. For our purposes, the most important among these is providing government credit to responsible rural borrowers in jeopardy of losing their homes through no fault of their own. *See* 42 U.S.C. § 1441. Toward this end, the Senate Report on the 1974 Amendments characterized the Secretary's refinancing authority as complementary to, not duplicative of, the FmHA's other loan servicing tools. It was hoped that, at least under some circumstances, the Secretary would use refinancing in lieu of moratorium relief at less cost to the government. Although the Secretary was also urged to use his refinancing authority "cautiously" and "prudently," especially in the various committee reports on the 1979 Amendments, we find nothing in the Act's legislative history that provides a sufficiently clear indication of the Secretary's reasons for the ban on refinancing FmHA loans.

Second, the "administrative record" of the Secretary's policy is also devoid of any evidence indicating that the Secretary, either in 1974 or 1981, engaged in a reasoned decisionmaking process with respect to the challenged regulation. The only pertinent part of the administrative record for either the 1974 or 1981 regulation in fact seems to consist of a single comment submitted to

the FmHA in response to the proposal of the latter regulation in 1980.[25]

Finally, we do not find the government's own explanations for the regulation to be so compelling as to disperse all reasonable doubt about the basis and purpose of the agency's action. The government first points out that the FmHA has two servicing tools available to FmHA borrowers that are not available to other borrowers: interest credits and moratorium relief. According to the government, especially when a moratorium is used in conjunction with reamortization, the tools together have the same practical effect as refinancing. To the government, the central question is "whether refinancing could save eligible borrowers in jeopardy of losing their homes through no fault of their own where existing tools would be to no avail." Appellant's Letter Brief of Nov. 21, 1984, at 3.

As we made clear in Part I, A, however, moratorium relief is available only if the borrower's housing costs constitute at least 35% of his family's adjusted income. Moreover, a moratorium functions essentially only to provide the borrower with a short-term breathing spell, not reduced monthly payments. A moratorium cannot help the rural homeowner who, through no fault of his own, is suffering a long-term reduction of income or an increase in necessary living expenses. Refinancing, in contrast, appears uniquely suited to help such a borrower. By spreading the debt over a new amortization term, refinancing, although extending the duration of the obligation, can reduce the amount of the regular monthly installments, possibly significantly. In response to the government's own question, therefore, we cannot say, based on what is before this court, that refinancing would fail to save eligible FmHA bor-

rowers in jeopardy of losing their homes when existing tools would be to no avail.

The government's second explanation for the proscription against the refinancing of FmHA loans is related to the first. The government argues that, because the FmHA's resources for rural home loans are finite and must be allocated among competing loan demands, the decision not to extend refinancing to FmHA borrowers, already receiving some benefit under the section 502 program, is reasonable. The government explains that, when the FmHA refinances a loan, it depletes its loan authority appropriated by Congress for that fiscal year. Extending moratorium relief and interest credits, on the other hand, does not obligate any of its funds currently available for new loans.

There can be no doubt that deciding where public money can best be spent is often a legitimate basis for the exercise of administrative discretion. *See, e.g., Heim v. United States*, 680 F.2d 564, 566 (8th Cir.1982). And, if the Secretary had articulated such a basis for its action prohibiting the FmHA from refinancing its own loans, the regulation might well have survived our judicial scrutiny today. The need to conserve resources, however, is not an administrative panacea that can be asserted by counsel to validate any regulation post hoc. Indeed, in most cases, economic factors of some sort can be presented in support of the particular regulation at issue, but "[s]peculations about what might have been good reasons had the agency only thought of them do not suffice." *Global Van Lines, supra,* at 1298–99. Further, we note in passing that, in promulgating the 1981 regulation, the Secretary failed to respond to the comment sub-

---

**25.** The comment, reproduced in the Appellant's Reply Brief at A–1, was submitted by the National Housing Law Project, which enjoys amicus status in the instant case. The National Housing Law Project is a California nonprofit corporation dedicated to furthering the development of the law toward an increasing recognition of the rights and needs of low-income tenants and homeowners in the United States. The government makes much of the fact that the

Secretary only received this one comment in response to its proposed 1981 regulation. We note, however, that, insofar as the regulation involved the interests of FmHA borrowers who, as a class, are not likely to review regularly the notices in the *Federal Register,* the lack of comments from individuals or organizations other than such entities as the National Housing Law Project is hardly surprising.

mitted on the proposed regulation suggesting that the FmHA could avoid using newly appropriated funds to repay previous appropriations by promulgating certain amendments to its regulations. These amendments would empower the FmHA to reamortize its own loans and provide interest credits in connection with that reamortization.

In sum, we are unable to discern the agency's path in prohibiting the FmHA from refinancing its own loans. Neither the legislative history nor the administrative record points the way, and the explanation furnished by counsel cannot be regarded as anything more than unacceptable post hoc rationalizations.

## III. CONCLUSION.

We hold that the Housing Act of 1979, as amended, does not impose an imperative duty on the Secretary to refinance FmHA loans. Both the plain meaning of the statute and its legislative history reveal that the eligibility requirements for refinancing is committed to the Secretary's discretion. However, the government has failed to demonstrate that regulation 7 C.F.R. § 1944.22(a), prohibiting the FmHA from refinancing its own loans, is a product of reasoned decisionmaking. Moreover, the Secretary in promulgating the regulation and its policy did not comply with the procedural mandates of section 553(c) requiring a general concise statement of basis and purpose incorporated therein. We, therefore, hold that the regulation as currently promulgated is arbitrary and capricious and thus invalid.

Because the basis of our conclusion is different from that of the district court, we do not affirm the judgment in all respects. It bears repeating that we do not hold today that a regulation prohibiting the refinancing of all FmHA loans is per se invalid under section 706(2)(A). Rather, we hold that 7 C.F.R. § 1944.22, prohibiting the FmHA from refinancing its own loans, does not survive judicial scrutiny because the Secretary has failed to explain cogently why he has exercised his discretion in the given manner. *See Motor Vehicle Manufacturers Ass'n, supra,* 463 U.S. at 48, 103 S.Ct. at 2869. Thus, we instruct the district court to modify its order accordingly. The revised order should allow the Garners to continue to make monthly payments into the registry of the court until the Secretary does one of three things: (1) considers the Garners' FmHA loan for refinancing under the same regulations previously applied to only non-FmHA loans; (2) considers the Garners' FmHA loan for refinancing under newly adopted regulations, perhaps applicable solely to FmHA borrowers; or (3) prohibits the refinancing of all FmHA loans under properly promulgated and otherwise valid regulations. We, of course, express no opinion regarding under what circumstances, if any, such regulations would be valid as a substantive matter. Costs shall be borne by the government.

AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.