# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CC-01522-SCT

*MISSISSIPPI TRUE*

*v.*

*DAVID J. DZIELAK, PH.D., IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE DIVISION OF MEDICAID, OFFICE OF THE GOVERNOR AND INDIVIDUALLY UPON BOND AND THE DIVISION OF MEDICAID, OFFICE OF THE GOVERNOR, STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 09/28/2018 |
| TRIAL JUDGE: | HON. WILLIAM H. SINGLETARY |
| TRIAL COURT ATTORNEYS: | CHARLES EDWARD COWAN |
| | GEORGE H. RITTER |
| | KATHRYN RUSSELL GILCHRIST |
| | EVERETT EAVES WHITE |
| | BRANT JAMES RYAN |
| | LAURA McKINLEY GLAZE |
| | PHILLIP BUFFINGTON |
| | TIMOTHY JAMES ANZENBERGER |
| | GORDON URBAN SANFORD, III |
| | TIMOTHY LEE SENSING |
| | JOHN BURLEY HOWELL, III |
| | CHARLES G. COPELAND |
| | TIMOTHY JOHN STERLING |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | GEORGE H. RITTER |
| | CHARLES EDWARD COWAN |
| ATTORNEYS FOR APPELLEES: | KATHRYN RUSSELL GILCHRIST |
| | BRANT JAMES RYAN |
| | ELIZABETH ERIN HYDE |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PATRICK H. BLACK |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 03/26/2020 |
| MOTION FOR REHEARING FILED: | |

MANDATE ISSUED:

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1.     An unsuccessful bidder on managed-care contracts for MississippiCAN, the state's managed-care program, argues that the Division of Medicaid and its executive director violated multiple statutes and regulations in procuring the contracts. Mississippi True appealed the decision of the chancery court affirming the Division of Medicaid's award of the contracts to three other companies and the chancery court's order denying its motion to sever and transfer its damages claims to circuit court.

**FACTS**

¶2.     In 2011, the Division of Medicaid (DOM) implemented a managed-care program for Mississippi Medicaid beneficiaries called Mississippi Coordinated Access Network (MississippiCAN). In 2014, the DOM issued a Request for Proposal (RFP) for managed or coordinated-care contractors for the state's MississippiCAN program. The DOM received proposals from seven offerors, including Mississippi True. Dr. David J. Dzielak was the executive director of the DOM during the issuance of the RFP and the execution of the MississippiCAN contracts.

¶3.     Based on scoring by an evaluation committee, the DOM awarded the contracts to three companies: Magnolia Health (Magnolia), Molina Healthcare of Mississippi, Inc. (Molina), and UnitedHealthcare of Mississippi, Inc. (United). Mississippi True, an unsuccessful bidder for the contract, requested that the DOM produce public records under the Mississippi Public

2

Records Act, including documents concerning the DOM's interactions with the successful bidders and the sealed competitive proposals of all other bidders.

¶4. Mississippi True filed its initial protest of the contract awards and posted the bond required by the RFP. That same day, the DOM instructed the three successful bidders to sign and return the contracts by noon the next day. The DOM and the winning offerors executed the MississippiCAN contracts before obtaining approval from the Personal Service Contract Review Board (PSCRB) or producing the sealed proposals of all other offerors as requested by Mississippi True. The DOM initially informed Mississippi True that it would not submit the contracts to the PSCRB and would "move forward with contract executions unless ordered to do otherwise by a [c]ourt." The DOM did eventually submit the contracts to the PSCRB for its approval on instruction by Governor Phil Bryant.

¶5. Mississippi True and another unsuccessful bidder filed amended protests, which included materials obtained from the public-records request. After review, the DOM denied Mississippi True's protest.

¶6. The PSCRB considered the contracts during its September 19, 2017 meeting. The contracts were not expressly approved or disapproved. The DOM announced that afternoon that it construed the PSCRB's failure to act as "statutory approval" of the contracts and would proceed with contract implementation. Mississippi True objected.

¶7. Mississippi True initially filed a damages suit in the Hinds County Circuit Court. The circuit court transferred this case to the chancery court, holding that at least a portion of Mississippi True's case was an administrative appeal that should first be heard in chancery

3

court, with the damages claims to be heard after the appeal. Mississippi True amended its original complaint to bring a claim against Dr. Dzielak in his individual capacity under Mississippi Code Section 31-7-57 (Rev. 2010), which holds an individual officer of a state agency liable for causing state law to be violated by the officer's actions in procuring a public contract.

¶8. The DOM filed the administrative-appeal record in chancery court and objected to including documents that post-dated the DOM's denial of Mississippi True's protest, including the PSCRB records. Mississippi True filed a motion to compel filing of additional record materials, requesting that the chancery court order the DOM to include in the record documents showing the DOM's failed attempt to obtain PSCRB approval for the contracts and the DOM's decision to implement the contracts without PSCRB approval. The DOM asserted that the procurement process ended with the DOM's final decision to deny Mississippi True's protest and that the requested additions to the record "did not exist until some date after [DOM's] final decision." The chancery court denied Mississippi True's motion to compel and struck its appeal brief, since it relied on the records that DOM refused to place in the administrative-appeal record. Mississippi True filed an amended administrative appeal, and the chancery court ultimately affirmed the decision of the DOM. The chancery court also denied Mississippi True's motion to sever and transfer its damages claims to circuit court and granted the DOM's motion to dismiss Mississippi True's damage claims as moot.

**STANDARD OF REVIEW**

4

¶9. The interpretation of a statute presents a question of law that this Court reviews de novo. *Miss. Ethics Comm'n v. Grisham*, 957 So. 2d 997 (Miss. 2007) (citing *32 Pit Bulldogs v. Cty. of Prentiss*, 808 So. 2d 971, 973 (Miss. 2002)). Additionally, in reviewing an agency's interpretation of a statute governing that agency's operation, this Court no longer gives deference to the agency's interpretation. *King v. Miss. Military Dep't*, 245 So. 3d 404, 407-08 (Miss. 2018), *abrogating Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of Medicaid*, 21 So. 3d 600 (Miss. 2018).

> The standard of review this Court employs when reviewing an administrative agency's decision is to determine whether the judgment "'(1) [w]as supported by substantial evidence; or (2) [w]as arbitrary or capricious; or (3) [w]as beyond the power of the lower authority to make; or (4) [v]iolated some statutory or constitutional right of the complaining party.'"

*Hill Bros. Constr. & Eng'g Co., Inc. v. Miss. Transp. Comm'n*, 909 So. 2d 58, 64 (Miss. 2005) (alterations in original) (quoting *Landmark Structures, Inc. v. City Council*, 826 So. 2d 746, 749 (Miss. 2002)). According to this Court,

> "Arbitrary" means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone,—absolute in power, tyrannical, despotic, non-rational,— implying either a lack of understanding of or a disregard for the fundamental nature of things.

> "Capricious" means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles. . . .

*Id.* at 70 (quoting *McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 322 (Miss. 1992)).

## DISCUSSION

5

¶10.    Mississippi received federal approval to implement a care-coordination program for targeted beneficiaries in the state.  In order to service the target populations in all eighty-two counties, the DOM released an RFP for managed or coordinated-care contractors who, if selected, would be responsible for providing services to eligible medicaid beneficiaries who participate in the program.  Mississippi True argues that the contracts awarded to the three winning bidders—Magnolia, United, and Molina—were unlawfully procured, executed, and implemented.  According to Mississippi True, the DOM's violation of numerous applicable statutes, regulations, and RFP provisions, taken together with the totality of the evidence, shows that the DOM's decisions to deny Mississippi True's protest and to implement the MississippiCAN contracts were arbitrary and capricious and contrary to state law.  This appeal of the DOM's award of the contracts is governed by the  "arbitrary and capricious" standard, which is a highly deferential standard of review.  *Miss. State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 489–90 (Miss. 1993) (citing *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985)).  Bearing in mind this very high standard, this Court finds that the DOM's decision was based on substantial evidence and did not amount to an arbitrary and capricious decision.

¶11.    Mississippi True's claims on appeal amount to four issues.  It argues the DOM was required to have the contracts approved by the PSCRB before execution; second, that the DOM erred by determining that Dr. Dzielak did not violate Mississippi conflict-of-interest laws; third, that the DOM erred by executing the contracts before the consideration of Mississippi True's formal protest; fourth, that the DOM demonstrated bias and prejudice in

6

its scoring of Mississippi True's proposal. Mississippi True alleges that this ultimately amounted to an arbitrary and capricious decision on the part of the DOM.

¶12. The MississippiCAN contracts were executed (not implemented) before PSCRB approval, but the contracts were ultimately considered by the PSCRB. The contracts were executed before the production of the sealed competitive proposals of other bidders, but Mississippi True was afforded time to protest the DOM's decision. Dr. Dzielak did correspond with bidders via email and meetings during the so-called "dead period," but there is no reasonable inference of bias or a conflict of interest on the part of Dr. Dzielak. Disparate or discriminatory scoring is a proper ground for reversal, but this Court does not find evidence of biased or discriminatory scoring of Mississippi True's proposal.

### 1. Personal Service Contract Review Board Approval

¶13. In its first issue, Mississippi True argues that the chancery court erred by failing to consider its contention that the MississippiCAN contracts were illegal due to the DOM's alleged failure to secure approval from the PSCRB.[1] As discussed above, the chancery court took Mississippi True's suit as an administrative appeal from the DOM's decision awarding the MississippiCAN contracts to other applicants. The chancery court cited a long string of Mississippi Supreme Court decisions holding that "[r]eview by the appellate court is limited to the record and to the agency's findings." *Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So. 2d 1192, 1202 (Miss. 2003) (citing *Miss. Comm'n on Envtl. Quality v. Chickasaw*

---

[1] On January 1, 2018, the Mississippi Personal Service Contract Review Board was "abolished" and replaced with the Public Procurement Review Board. *See* H.B. 1109, Reg. Sess., 2017 Miss. Laws ch. 400.

***Cty. Bd. of Sup'rs***, 621 So. 2d 1211, 1216 (Miss. 1993)). Mississippi True based its arguments on Mississippi Rule of Appellate Procedure 10(e). But "[t]his Court has held that Rule 10(e) 'is not a vehicle for admitting new evidence into the record, a role generally reserved for the trial court; rather Rule 10(e) is a method for correcting the appellate record to reflect what occurred in the trial court.'" ***Russell v. Humphreys Cty. Bd. of Supervisors (In re Validation of Tax Anticipation Note, Series 2014)***, 187 So. 3d 1025, 1031 (Miss. 2016) (quoting ***Corrothers v. State***, 148 So. 3d 278, 315 (Miss. 2014)). "Rule 10(e) . . . contemplates omission from the appellate record by error, accident, or misstatement." ***Id.*** at 1031-32. "Rule 10(e) does not contemplate adding to the record material documenting what has occurred after the entry of a final judgment in the trial court." ***Id.*** at 1041. The chancery court concluded that the documents Mississippi True sought to add to the record for its PSCRB arguments were either available before the final decision of the DOM, or were created afterwards; in either case, the chancery court concluded the documents "do not reflect what occurred 'in the trial court' and are not properly included as part of this administrative appeal."

¶14. Mississippi True also argues that the DOM is judicially estopped from citing the proffered records because the DOM argued that they should be excluded from evidence. But the rule is that error cannot be predicated on the exclusion of evidence unless it affects a substantial right of the complaining party. *See, e.g.*, ***Waller v. Wall***, 273 So. 3d 717, 720 (Miss. 2019); *see also* M.R.E. 103(a). The DOM's argument is not only valid, it is routine.

¶15. We conclude that the trial court's holdings are irrelevant as to the scope of the review and as to whether the records from the PSCRB application should have been considered, because Mississippi True's own proffer demonstrates that its contentions are without merit.

¶16. The proffered PSCRB minutes reflect that the MississippiCAN contracts were submitted to the PSCRB for approval and that the PSCRB took no action. Under the statute, "any contract submitted to the [PSCRB] for review and approval shall be presumed to be approved if the [PSCRB] does not object to the contract within thirty (30) days of the agency's submission of the contract." Miss. Code Ann. § 25-9-120(4) (Supp. 2016). The PSCRB's regulations further provide that "[i]f the PSCRB rejects a contract . . . it shall clearly state the basis of its action, including, but not limited to, the policy violated and any corrective actions necessary to bring the contract in compliance with the PSCRB Rules and Regulations." 27 Miss. Admin. Code Pt. 1, R. 7-106 (amended July 1, 2016), Westlaw.

¶17. The PSCRB minutes reflect that the PSCRB was presented with a staff recommendation to approve the MississippiCAN contracts, but no motion was made to approve the staff recommendation. A single board member moved to disapprove the contracts, but the motion was not seconded.

¶18. Mississippi True argues that since the DOM requested certain exceptions in addition to approval of the contract, the PSCRB did not really consider the contract. This Court finds that contention without merit because the PSCRB minutes clearly reflect that, in addition to the exceptions, review and approval of the contracts was also requested. That is all the statute requires. *See* Miss. Code Ann. § 25-9-120.

9

¶19. Next, Mississippi True contends that the PSCRB approval was invalid because the contracts were executed before they were submitted to the PSCRB. As noted above, the DOM initially took the position that PSCRB approval was not required, and previous MississippiCAN contracts apparently were not submitted to the PSCRB on the theory that they were insurance contracts rather than personal service contracts. The statute, Mississippi Code Section 25-9-120 (Supp. 2016), does not expressly require PSCRB approval before execution. The PSCRB regulations, however, do seem to assume that contracts should not be executed before approval; they read in relevant part—"After the approval of a contract by the PSCRB, the contract may be executed by the agency and the vendor." 27 Miss. Admin. Code Pt. 1, R. 7-117 (amended July 1, 2016), Westlaw.

¶20. But the regulations do not expressly say that the contract can only be executed after approval. And, as discussed above, the PSCRB approved the contracts *de facto* by not disapproving them. Moreover, the attorney general has opined that the PSCRB may ratify a contract after the fact. Miss. Att'y Gen. Op., No. 1999-0272, 1999 WL 529131, *Stringer*, at *2 (June 25, 1999). Since the PSCRB rules and regulations do not require approval before execution, this Court rejects Mississippi True's argument that the PSCRB approval was invalid.

¶21. Finally, Mississippi True contends that the chancery court did not resolve all of its claims, because it failed to reach the question of individual liability for violation of the PSCRB statute. Because there is no violation of the PSCRB statute, there is no error.

¶22. Therefore, the question of whether the chancery court should have considered the PSCRB approval is irrelevant, because the proffered PSCRB minutes indicate that the PSCRB ratified the MississippiCAN contracts.

### 2. Conflict of Interest

¶23. Next, Mississippi True contends that the DOM's executive director, Dr. Dzielak, had a conflict of interest due to his discussions with agents of one of the bidders, Molina. Mississippi True points to two emails that it contends show that Dr. Dzielak had discussed a job offer. The first email, dated January 14, 2015, was from Dr. Dzielak to Gwen Williams, an associate vice president for Molina. It was entitled, "Catching Up" and said,

> Gwen:
>
> I decided not to send in my information. The compensation is going to be an issue. As such, if I really don't want the job then the fact I applied may get out and that would create an issue for me in my current position. Thanks for the heads up though, I really appreciate it and your support.
>
> David

Williams's reply was, "I fully understand and think that's a wise decision. I'll keep my eyes and ears open. You never know what will turn up in the future." Mississippi True notes that Dr. Dzielak had several meetings with Molina agents in 2015 and 2016, including one in Richmond, Virginia. An email from Molina representative David Boim, dated August 4, 2016, and titled, "Follow Ups," read,

> Hello Dr. Dzielak,
>
> So Great to see you today[.] I Really appreciated catching up with you.
>
> Couple of follow ups:

11

1) The Richmond moving company is called Moxie Movers. They tend to book up fast. www.moxiemovers.com

Call Jesse at [omitted]. Both me and my wife [sic] loved the job they do at a fair price.

2) The Plan President Position salary range is $186K to $345K (salary only) depending on qualification factors. Short and long term benefits would be in addition. We would also be looking for a COO which would be the President's operations leader.

I will follow up on the Value Based discussion tomorrow.

Warm Regards,
Dave

¶24.    Mississippi True alleges that these emails show, or at least "an objective person could easily conclude" from them, that Dr. Dzielak was discussing future employment with Molina. It argues that "an objective observer would interpret [the second email] as a job [offer] for Dzielak."

¶25.    Mississippi True made these conflict-of-interest allegations in its protest; the DOM considered affidavits from some of the people involved that averred no one from Molina had ever offered Dr. Dzielak a job or suggested they might. The sender of the second email stated in his affidavit that he had no hiring authority at Molina and had asked Dr. Dzielak "to provide the names of potential candidates in the Mississippi community, in the event Molina were to win a contract." According to Dr. Dzielak, the note about movers in Richmond, Virginia, was intended for Dr. Dzielak's elderly mother, who lived there.

¶26. According to Mississippi True, the DOM was not authorized to investigate a potential conflict of interest; instead, Dr. Dzielak "was required to immediately disqualify himself and report the issue to the Ethics Commission."

¶27. Mississippi True points to 27 Mississippi Administrative Code Part 1, Rule 6-203 (amended July 1, 2016), Westlaw, which addresses conflicts of interest of government employees participating in contract procurement. It says in relevant part,

(a) **Conflict of Interest**.

It shall be a breach of ethical standards for any employee to participate directly or indirectly in a procurement when the employee knows that:

(1) the employee or any member of the employee's immediate family has a financial interest pertaining to the procurement;

(2) a business or organization in which the employee, or any member of the employee's immediate family, has a financial interest pertaining to the procurement; or,

(3) any other person, business, or organization with whom the employee or any member of the employee's immediate family is negotiating or has an arrangement concerning prospective employment is involved in the procurement.

(b) **Discovery of Actual or Potential Conflict of Interest, Disqualification, and Waiver.**

Upon discovery of an actual or potential conflict of interest, an employee shall promptly file a written statement of disqualification and shall withdraw from further participation in the transaction involved. The employee shall, at the same time, apply to the Ethics Commission for an official advisory opinion as to what further participation, if any, the employee may have in the transaction.

¶28. This Court is uncomfortable with Dr. Dzielak's socializing with representatives from companies with which the DOM does business, especially during the time that the company

13

was bidding for a multibillion dollar contract with the DOM. This Court does not condone such conduct. But in analyzing the documented contacts, spread as they are over several years, this Court cannot conclude that the contacts were excessive or unusual for an administrator in Dr. Dzielak's position.

¶29. Taking into consideration the evidence provided, this Court does not find any merit to Mississippi True's contentions that Dr. Dzielak had an actual or potential conflict of interest; we agree with the chancellor that the documented contacts show "no evidence of an actual or potential conflict for Dzielak." Neither email necessarily demonstrates that Dr. Dzielak was offered a job with Molina or that he was negotiating for an offer. The first email, about a year and a half before the bidding process at issue here begins, indicates only that an acquaintance of Dr. Dzielak's, who worked for Molina, had brought to his attention a job opportunity somewhere and that Dr. Dzielak had declined to apply for it. The second email contains the description of a position at Molina, but it contains nothing suggesting it was offered to Dr. Dzielak. In fact, the wide salary range for the position suggests it was not an offer for any particular person. And the note about movers in Virginia does not seem to be consistent with an offer for a "plan president" in Mississippi; Mississippi True seems to concede that it was for a position in Mississippi or at least relating to Mississippi operations. It also not clear how Dr. Dzielak could have taken that position and still been in a position to influence the procurement.

¶30. The regulations cited by Mississippi True make it a "breach of ethical standards for any employee to participate directly or indirectly in a procurement when the employee

14

knows" about his conflict of interest. 27 Miss. Admin. Code Pt. 1, R. 6-203(a). And the employee is only required to recuse and submit the question to the Ethics Commission when the employee "discovers" "an actual or potential conflict of interest." 27 Miss. Admin. Code Pt. 1, R. 6-203(b). This Court understands a "potential" conflict of interest to entail more than the possibility that an allegation might be leveled based on two ambiguous emails.

¶31. Mississippi True also argues that even if one accepts the proffered explanations, Dzielak had a conflict of interest because the opportunity to recommend candidates was something of value, a "quid pro quo," if Molina were to get the contracts. Whatever value that may have, it does not implicate the regulations cited above. *See* 27 Miss. Admin. Code Pt. 1, R. 6-203.

¶32. Finally, Mississippi True complains that the DOM was not authorized or equipped to investigate allegations of a conflict of interest. This point is irrelevant, because Mississippi True failed to make even a prima facie case of a conflict of interest; no investigation or consideration of affidavits was necessary to resolve the protest.

¶33. Given our standard of review, this Court does not find that the DOM was arbitrary or capricious in finding no bias or conflict of interest on the part of Dr. Dzielak.

### 3. Execution of Contracts Before Consideration of Protest

¶34. Mississippi True's next issue mirrors its contentions above; it argues that a statute, Mississippi Code Section 25-61-5(1)(b) (Supp. 2016), required that the DOM delay its execution of the MississippiCAN contracts. The statute provided, in relevant part,

> Production of competitive sealed proposals in accordance with requests made pursuant to this section shall be no later than seven (7) working days after the

15

notice of intent to award is issued to the winning proposer. Persons making a request for production of competitive sealed proposals after the notice of intent to award is issued by the public body shall have a reasonable amount of time, but in no event less than seven (7) working days after the production of the competitive sealed proposals, to protest the procurement or intended award prior to contract execution.

Miss. Code Ann. § 25-61-5(1)(b) (Supp. 2016).

¶35. The record reflects that Mississippi True submitted its protest on June 29, three days after requesting the sealed bids (and long before they were provided). The contracts were executed on June 30, the day after the protest was received. Mississippi True argues that the the DOM's execution of the contracts before producing the sealed competitive proposals of the other bidders and before affording Mississippi True the right to protest renders the entire RFP process void.

¶36. But the DOM did not violate Section 25-61-5(1)(b) because it waited until after Mississippi True submitted its protest, albeit without the opportunity to consider the sealed bids. Mississippi True complains on appeal that it had no choice but to protest without the sealed bids, because the RFP allowed only ten days to protest; but there was no contemporaneous complaint. Since the DOM executed the contracts after receiving Mississippi True's protest, the DOM technically did not violate the statute; the statute does not require that the protest be resolved before execution, just that a reasonable amount of time be allowed for the protest to be offered before it. And because Mississippi True suffered no prejudice from the early execution of the contracts, the Court finds no error.

¶37. Mississippi True was allowed to amend its protest after receiving the sealed bids. Its only contention as to prejudice as a result of the early execution of the contracts is its

16

baseless assertion that execution committed the DOM to those contracts and somehow exposed the DOM's agents to individual liability if the protest was subsequently found to be meritorious. This argument is not fully developed, but the same contentions were made in the PSCRB issue above. Moreover, Section 3.6 of the RFP expressly provided that "no Offeror shall infer or be construed to have any rights or interest to a contract with the Division *until final approval is received from all necessary entities* and until both the Offeror and the Division have executed a valid Contract." (Emphasis added.) If the PSCRB had rejected the contracts, or if the DOM had found the protest meritorious, there would be no "final approval . . . from all necessary entities" and even executed contracts would not bind the DOM. This Court reads the RFP as providing that mere execution, by itself, does not bind the DOM and thus could not be construed as prejudicing Mississippi True in the protest process.

### 4. Bias and Discriminatory Scoring Standards

¶38. Finally, Mississippi True asserts that the DOM engaged in bias and prejudice in scoring the proposals. The DOM points out in its brief that the subjective scoring decisions of the evaluation committee are not permitted grounds for protesting under the express terms of the RFP. Mississippi True does not dispute this. Instead, it brings its protest on the ground of bias and discrimination, which is permissible under the RFP. Mississippi True points to multiple sections of the proposal in which it alleges that it was incorrectly scored lower than the other offerors as a result of disparate scoring standards, including "Corporate Background and Experience," "Corporate Financial Statements and Conditions," "Resumes

17

of Key Employees," "References," and "Subcontractors." It also alleges that the winning bidders were awarded "bonus points" for being incumbent contractors.

¶39. For example, Mississippi True cites as bias the DOM's decision to accept information from other offeror's parent companies, including corporate financial statements and corporate background and experience. Mississippi True was scored a two out of five on the Corporate Background and Experience section because it reported fewer than three years of experience.[2] By comparison, Amerigroup and Molina were given scores of four out of five for the background and experience of their corporate parents or affiliates. But the RFP explained that the information of parent companies would be accepted. In each section that Mississippi True alleges scoring errors, the evaluators assert that Mississippi True's failure to adequately address the requirements of the sections is the reason for the low scores—not because of any bias or discrimination on the part of the evaluators.

¶40. The scoring of the proposals does not rise to the level of "arbitrary and capricious." In other words, the scoring was not "freakish, fickle, or arbitrary," "[done] without reason, in a whimsical manner, [or] implying either a lack of understanding of or a disregard for the surrounding facts . . . ." *McGowan*, 604 So. 2d 312, 322 (Miss. 1992). Mississippi True may disagree with the reasons provided by the evaluators for its scores. But that falls within the realm of the professional judgment of the evaluators and is therefore outside the standard of our review.

---

[2] The reason for this score was provided by the DOM on Mississippi True's score sheet.

¶41. Mississippi True was allowed time to supplement its protest, and each assertion of error was considered. This Court has carefully reviewed the administrative record and analyzed each proposal regarding each of these sections and ultimately agrees with the findings of the chancery court with respect to this issue—Mississippi True has failed to provide any evidence or point to any specific instance of improper scoring. No error has been shown.

## CONCLUSION

¶42. "A rebuttable presumption exists in favor of the actions of an administrative agency, and the burden of proof is on the party challenging an agency's actions." *Hill Bros. Constr.*, 909 So. 2d at 64 (citing *Pub. Emps.' Ret. Sys. v. Marquez*, 774 So. 2d 421, 425 (Miss. 2000)). As explained by this Court, "Because of their expertise and the faith we vest in [administrative agencies], we limit our scope of judicial review." *Id.* at 64 (internal quotation marks omitted) (quoting *McGowan*, 604 So. 2d at 323). Mississippi True has not met its burden. This Court has thoroughly reviewed the voluminous record and has concluded that Mississippi True has failed to prove any basis for reversal. The decision of the DOM was supported by substantial evidence, was not arbitrary or capricious, was not beyond the DOM's power to make, and did not violate Mississippi True's statutory or constitutional rights.

¶43. **AFFIRMED.**

**KITCHENS AND KING, P.JJ., AND BEAM, J., CONCUR. RANDOLPH, C.J., MAXWELL AND CHAMBERLIN, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J. GRIFFIS, J., DISSENTS WITH**

19

**SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J.; MAXWELL AND CHAMBERLIN, JJ., JOIN IN PART.**

**COLEMAN, JUSTICE, DISSENTING:**

¶44. I agree with Justice Griffis's dissent. I write separately, however, to address the applicable standard of review for agency interpretation of regulations. Although the plurality is silent as to the standard of review applicable to agency interpretation of regulations, it is an issue in the instant appeal.

¶45. The standard of review regarding executive-branch interpretations of its own regulations seems ever-changing. In one instance, we described it as follows:

> The standard of review this Court employs when reviewing an administrative agency's decision is to determine whether the judgment "'(1) [w]as supported by substantial evidence; or (2) [w]as arbitrary or capricious; or (3) [w]as beyond the power of the lower authority to make; or (4) [v]iolated some statutory or constitutional right of the complaining party.'"

*Hill Bros. Constr. & Eng'g Co. v. Miss. Transp. Comm'n*, 909 So. 2d 58, 64 (Miss. 2005) (quoting *Landmark Structures, Inc. v. City Council for City of Meridian*, 826 So. 2d 746, 749 (Miss. 2002)). On the other hand, in *Crossgates River Oaks Hosp. v. Miss. Div. of Medicaid*, the Court explained that "[a]n agency's interpretation of a rule governing the agency's operation is a matter of law that is reviewed de novo, but with great deference to the agency's interpretation." *Crossgates River Oaks Hosp. v. Mississippi Div. of Medicaid*, 240 So. 3d 385, 387 (¶ 7) (Miss. 2018) (citing *Sierra Club v. Miss. Envtl. Quality Permit Bd.*, 943 So. 2d 673, 678 (¶ 11) (Miss. 2006). The lack of uniformity is further showcased in *Diamond Grove Center, LLC v. Mississippi State Department of Health*, in which the Court explained "[w]e will not, however, give deference to an agency's statutory

20

interpretation if it is so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, or contrary to the unambiguous language or best reading of a statute." ***Diamond Grove Ctr., LLC v. Miss. State Dep't of Health***, 98 So. 3d 1068, 1072 (¶ 9) (Miss. 2012) (citing ***Dialysis Sol., LLC v. Miss. State Dep't of Health***, 31 So. 3d 1204, 1211 (¶ 22) (Miss. 2010)). Accordingly, we have described the level of deference with phrases ranging from *de novo*, which of course means no deference, great deference, and points in between, *e.g.*, deference as long as in the minds of five or more members of the court the agency interpretation comports with the best reading of a statute.

¶46. "Article 1, Section 1 of the Mississippi Constitution of 1890 divides the power of state government into three branches and assigns legislative powers to the legislative branch, judicial powers to the judicial branch, and executive power to the executive branch." ***King v. Miss. Military Dep't***, 245 So. 3d 404, 407–08 (¶ 10) (Miss. 2018). "Executive-branch agencies must follow statutes and, absent a declaration from the judicial branch regarding an interpretation of a statute, must decide what statutes mean." ***Id.*** at 408 (¶ 11). "[W]hen deference is given to an agency interpretation, we share the exercise of the power of [regulatory] interpretation with another branch in violation of Article 1, Section 2." ***Id.*** "Nothing is more clear than that it is beyond the scope of legislative authority, to put a construction upon its laws which can be obligatory upon the courts. The province of the legislature is to enact laws, that of the court is to expound or interpret them." ***Planters' Bank v. Black***, 19 Miss. 43, 50-51 (1848).

¶47. In the instant matter, the Division interpreted the rules and regulations of another administrative agency, the Board. Pl. Op. ¶ 19. The Division's interpretation and application of the Board's regulations equate to the exercise of judicial powers. The Mississippi Constitution reserves such power for the judiciary once the matter has entered the courts, not an administrative agency. Ceding part of the judicial authority to the executive branch when interpreting regulations places parts of all three functions of government—legislative, judicial, and executive—in one branch of government in violation of Article 1, Section 2, of the Mississippi Constitution.

¶48. "[T]he ultimate authority and responsibility to interpret the law, including statutes, rests with th[e] Court." *Diamond Grove Ctr*, 98 So. 3d at 1072 (¶ 9) (internal quotation marks omitted) (quoting *Queen City Nursing Ctr., Inc. v. Miss. State Dep't of Health*, 80 So. 3d 73, 84 (¶ 28) (Miss. 2011)). Black's Law Dictionary defines "law" as "1. The regime that orders human activities and relations through systematic application of the force of politically organized society, or through social pressure, backed by force, in such a society; the legal system <respect and obey the law>." *Law*, Black's Law Dictionary (11th ed. 2019).[3]

---

[3] Other definitions include

2. The aggregate of legislation, judicial precedents, and accepted legal principles; the body of authoritative grounds of judicial and administrative action; esp., the body of rules, standards, and principles that the courts of a particular jurisdiction apply in deciding controversies brought before them <the law of the land>. 3. The set of rules or principles dealing with a specific area of a legal system <copyright law>. 4. The judicial and administrative process; legal action and proceedings <when settlement negotiations failed, they submitted their dispute to the law>. 5. A statute <Congress passed a

¶49.    In **King**, the Court ended the practice of giving deference to administrative agencies'

interpretations of statutes. **King**, 245 So. 3d at 408 (¶ 12).  Regulations, like statutes, are law.

"The interpretation of an existing [regulation] is a question of law, therefore the Court should

review it *de novo* rather than with deference."  **Hatfield v. Bd. of Supervisors of Madison**

**Cty.**, 235 So. 3d 18, 27 (¶ 41) (Miss. 2017) (Coleman, J., concurring in part and in result).

I would end the unconstitutional and inconsistent practice of deferring to executive agencies

when interpreting agency regulations and hold that such pure questions of law are subject to

*de novo* review in the courts.

**GRIFFIS, J., JOINS THIS OPINION.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶50.    Because the Division of Medicaid (DOM) and its former executive director, Dr. David

J. Dzielak,[4] violated various statutory and regulatory requirements in awarding public

contracts, the decision should be reversed, and the public contracts should be vacated.

Therefore, I respectfully dissent.

¶51.    In 2011, the DOM implemented a managed-care program for Mississippi Medicaid

beneficiaries called Mississippi Coordinated Access Network (MississippiCAN).  On

February 3, 2017, the DOM issued a Request for Proposals (RFP) for managed care or

coordinated-care contractors for the MississippiCAN program.  The RFP specifically stated

---

law>. — Abbr. L.

*Law*, Black's Law Dictionary (11th ed. 2019)

[4] Dr. Dzielak was executive director until December 2017.

23

that the DOM sought competitive written proposals from qualified offerors to provide services for statewide administration of the MississippiCAN. The RFP further stated that the procurement process was guided by the appropriate provisions of the Personal Service Contract Review Board's (PSCRB) rules and regulations. Dr. Dzielak, the DOM's executive director, was responsible for reviewing the proposals.

¶52. On June 15, 2017, the DOM awarded the contracts to three companies: Magnolia Health (Magnolia), Molina Healthcare of Mississippi, Inc. (Molina), and UnitedHealthcare of Mississippi, Inc. (United). Mississippi True, an unsuccessful bidder, requested that the DOM produce public records under the Mississippi Public Records Act, including documents regarding the DOM's interactions with the successful bidders and the sealed competitive proposals of the other offerors.

¶53. On June 29, 2017, Mississippi True filed its initial protest of the contract awards. Approximately two hours after Mississippi True filed its initial protest, the DOM emailed Magnolia, Molina, and United their respective contracts and instructed them to execute and return the contracts by noon the next day. On June 30, 2017, the DOM, Magnolia, Molina, and United executed the public contracts.

¶54. The DOM's attorney advised Mississippi True that the DOM did not intend to submit the contracts to the PSCRB and would move forward with the contract executions unless ordered to do otherwise by a court.[5] But on July 18, 2017, at Governor Phil Bryant's instruction, the DOM submitted the already-executed contracts to the PSCRB for approval.

---

[5] Unbeknownst to Mississippi True, the contracts had already been executed.

¶55. On August 18, 2017, Mississippi True filed its amended protest, which included materials obtained from its public-records request. The DOM denied Mississippi True's protest on August 29, 2017.

¶56. The PSCRB considered the public contracts at its meeting on September 19, 2017. The PSCRB's staff's report noted that the DOM improperly treated the procurement as an RFP when it should have been a Request for Qualifications (RFQ). The report further noted that the DOM requested exceptions to the PSCRB's rules and regulations because the RFP, as issued, did not comply with those rules and regulations. The report concluded that upon granting the exceptions, the contracts would comply with the PSCRB's rules and regulations and all legal requirements. The report recommended that the contracts be approved as requested. The DOM joined this request.

¶57. At the meeting, some board members expressed concerns over how the contracts were procured. Following discussion, the PSCRB chairman called for a motion to approve the staff recommendation by granting the exceptions and approval of the contracts as requested. No motion was made. The PSCRB's official minutes read, in part, "Action: After discussion, no motion was made to approve the staff recommendation. A motion was made by Mr. Moran to disapprove [certain items] and instruct the [DOM] to re-procure the services. The motion died due to lack of a second."

¶58. The DOM announced that it construed the PSCRB's failure to act as statutory approval of the contracts and advised that it would proceed with contract implementation.

25

Mississippi True objected to this decision. It later filed an administrative appeal in the chancery court.

¶59. Mississippi True argues that the contracts awarded were unlawfully procured, executed, and implemented. I agree and separately address Mississippi True's issues.

> I. *Execution of the Contracts Before the PSCRB's Approval and Before Consideration of Mississippi True's Protest*

¶60. I disagree with the plurality and find the chancery court erred by not considering the PSCRB records. The DOM determined, at some point, that the contracts must be submitted to and approved by the PSCRB. Thus, the PSCRB records were material to and essential to the resolution of this matter.

¶61. Under Mississippi Code Section 25-9-120(3)(b) (Supp. 2016),[6] the PSCRB shall "[a]pprove all personal and professional services contracts involving the expenditures of funds in excess of Seventy-five Thousand Dollars ($75,000)[.]" Additionally, under the PSCRB's rules and regulations, contracts may be executed by the agency and the vendor "*[a]fter* the approval . . . by the PSCRB. . . ." 27 Miss. Admin. Code Pt. 1, R. 7-117 (amended July 1, 2016) (emphasis added), Westlaw.

¶62. Here, the PSCRB was not presented with and did not approve the contracts before they were executed by the DOM, Magnolia, Molina, and United. Instead, by the time the contracts were presented to the PSCRB for consideration and approval, they had been

---

[6] Effective January 1, 2018, Section 25-9-120 was amended and transferred the PSCRB's powers and responsibilities to the newly created Public Procurement Review Board. *See* H.B. 1109, Reg. Sess., 2017 Miss. Laws ch. 400.

executed by all applicable parties. In my opinion, the statute and rules clearly indicate that the contracts must be submitted to PSCRB for approval before the contracts are executed.

¶63. I do not agree with the plurality's conclusions that "the PSCRB approved the contracts *de facto* by not disapproving them" and that "the proffered PSCRB minutes indicate that the PSCRB ratified the MississippiCAN contracts." Pl. Op. ¶¶ 20, 22. The PSCRB minutes do not reflect an affirmative approval of these contract by the PSCRB.

¶64. Section 25-9-120(3)(b) requires the PSCRB to "approve all personal and professional service contracts" involving more than $75,000 in expenditures. This is an affirmative duty on the PSCRB to review, consider and decide whether to approve such contracts. The plurality reasons that there was a statutory or presumptive "approval" by the PSCRB. Pl. Op. ¶ 16. Section 25-9-120(4) states that "[a]ny contract submitted to the [PSCRB] for review and approval shall be presumed to be approved if the [PSCRB] does not object to the contract within thirty (30) days of the agency's submission of the contract. Miss. Code Ann. § 25-9-120(4) (Supp. 2016).

¶65. Subsections (3) and (4) of Section 25-9-120 appear to conflict; is an affirmative act of approval required or not? Rules of statutory construction require statutes to be read in pari materia (harmoniously). *Brown v. State*, 102 So. 3d 1087, 1092 (Miss. 2012). In my opinion, subsection (4) is limited to situations in which the PSCRB has not yet considered proposed contracts. This subsection would allow the contracts submitted but not reviewed to be presumed approved unless an there is objection. If this subsection is construed as grant implicit approval of a contract whenever the PSCRB considers and debates but does not

27

approve a contract due to lack of a motion, the PSCRB's duty to approve contracts under subsection (3)(b) is meaningless and the statutory purpose defeated. The PSCRB would not have to review or consider any proposed contracts because all contracts would become "statutorily approved" after thirty days. The responsibility delegated to the PSCRB by the Legislature would be a fiction. Also, the PSCRB's rules and regulations expressly state that contracts may be executed by the agency and the vendor "*[a]fter* the approval . . . by the PSCRB. . . ." 27 Miss. Admin. Code Pt. 1, R. 7-117 (emphasis added). This clearly anticipates an affirmative ruling on approval and requires that contracts be executed "after" approval. Because the PSCRB must approve all contracts in order for those contracts to be valid, it follows that the execution of those contracts should come after approval. To do otherwise circumvents the contracting process and the public's trust in the process.

¶66. Additionally, under Mississippi Code Section 25-61-5(1)(b) (Rev. 2018), "[p]ersons making a request for production of competitive sealed proposals . . . shall have a reasonable amount of time . . . to protest the procurement or intended [contract] award *prior to contract execution*." Miss. Code Ann. § 25-61-5(1)(b) (Rev. 2018) (emphasis added). But the record shows that the contracts were executed before the production of the sealed competitive proposals and before the deadline for Mississippi True's protest. In fact, the record shows that just two hours after Mississippi True filed its initial protest, the DOM emailed the contracts to Magnolia, Molina, and United for review and signature. The contracts were executed by all applicable parties the next day.

¶67. The plurality finds Mississippi True "suffered no prejudice" because "Mississippi True was allowed to amend its protest after receiving the sealed bids." Pl. Op. ¶¶ 36-37. But this ignores the fact that the contracts had already been executed by Dr. Dzielak and the DOM before consideration of Mississippi True's protest and before approval by the PSCRB. Dr. Dzielak and the DOM were aware of Mississippi True's protest and public-records request when they executed the contracts. Simply because Mississippi True was allowed to amend its protest to include materials received in its public-records request does not change the fact that the contracts had already been executed, contrary to Section 25-61-5(1)(b). Mississippi True was certainly prejudiced when Dr. Dzielak, the state employee responsible for the determination of Mississippi True's protest, executed the contracts before consideration of the protest. The DOM's execution of the contracts before the PSCRB's approval, before the production of the sealed competitive proposals, and before providing Mississippi True the right to protest indicates that its decision was already made regardless of Mississippi True's statutory and regulatory rights.

¶68. The plurality notes that "Section 3.6 of the RFP expressly provided that 'no Offeror shall infer or be construed to have any rights or interest to a contract with the [DOM] *until final approval is received from all necessary entities* and until both the Offeror and the [DOM] have executed a valid Contract.'" Pl. Op. ¶ 37. The plurality therefore concludes that "[i]f the PSCRB had rejected the contracts, or if the DOM had found [Mississippi True's] protest meritorious, there would be no 'final approval . . . from all necessary entities' and even executed contracts would not bind the DOM." Pl. Op. ¶ 37. But this "no harm, no

29

foul" reasoning ignores the DOM's disregard of statutory and regulatory laws and creates a cloud of doubt on the integrity of public contracting.

¶69.    The integrity of public contracting requires that our state departments, divisions, and employees follow all statutory and regulatory laws.  Because the DOM failed to follow the applicable statutory and regulatory laws in the procurement, execution, and implementation of the MississippiCAN contracts, those contracts should be set aside and vacated.

## II.    *Biased and Discriminatory Scoring*

¶70.    According to the RFP, biased or discriminatory scoring of the proposals was grounds for protesting the decision.  Some examples of the biased and discriminatory scoring alleged by Mississippi True include, but are not limited to, areas such as corporate background and experience, incumbent contractors, and resumes of key employees.

¶71.    Regarding corporate background and experience, Mississippi True received a two-point score.  The reason for such score was that Mississippi True had less than three years of experience.   But the RFP did not require three years of corporate experience.  Additionally, Magnolia and United received bonus points based on incumbency.   But incumbency was not one of the evaluation factors listed in the RFP.

¶72.    The RFP "shall state all of the evaluation factors . . . and their relative importance." 27 Miss. Admin. Code Pt. 1, R. 3-203.13.1 (amended July 1, 2016), Westlaw.   "The evaluation shall be based on the evaluation factors set forth in the [RFP]" and those "[f]actors not specified in the [RFP] shall not be considered."  27 Miss. Admin. Code Pt. 1, R. 3-

30

203.13.2 (amended July 1, 2016), Westlaw. Despite not being specified in the RFP, it appears factors such as three years of corporate experience and incumbency were considered.

¶73. Regarding the resumes of key employees, Section 5.5.2 of the RFP required the "[o]fferors . . . [to] submit resumes of all proposed key staff persons." Mississippi True complied and identified its chief executive officer, chief operations officer, chief financial officer, chief information officer, medical director, and compliance officer. Mississippi True scored only one point because it did not provide the resumes of replacement managers that would be hired if the contract was awarded to Mississippi True. But the RFP asked for replacement personnel resumes only if changes in management were expected. Because Mississippi True did not expect managerial changes, it did not submit any other resumes.

¶74. All other bidders, except Amerigroup, were awarded the maximum three points despite their failure to provide resumes of replacement managers. For instance, Molina listed in its proposal Plan President and Chief Executive Officer Robert Church, Chief Operations Officer Daniel Shivers, and Chief Medical Officer Dr. Dianna Grant as key staff persons. It did not disclose any anticipated replacements of key personnel, and it did not provide the resumes of replacement managers. Yet, shortly after the contract was awarded to Molina, Church, Shivers, and Grant were either terminated or resigned from Molina.

¶75. The RFP required the DOM to "ensure the fair and equitable treatment of all persons and [o]fferors in regards to the procurement process." As with the execution of the contracts, the DOM's scoring methods create doubt that the procurement process was "fair and equitable."

31

*III.    Dzielak's Conflict of Interest*

¶76.    While I agree with the result reached by the plurality regarding Dr. Dzielak's alleged conflict of interest, Dr. Dzielak's actions should not be trivialized and should certainly not be encouraged.

¶77.    Our Legislature has declared that

> elective and public office and employment is a public trust and any effort to realize personal gain through official conduct, other than as provided by law, or as a natural consequence of the employment or position, is a violation of that trust. Therefore, public servants shall endeavor to pursue a course of conduct which will not raise suspicion among the public that they are likely to be engaged in acts that are in violation of this trust and which will not reflect unfavorably upon the state and local governments.

Miss. Code Ann. § 25-4-101 (Rev. 2018).

¶78.    As I have previously emphasized, the integrity of public contracting requires strict adherence to statutory and regulatory laws. While Dr. Dzielak's actions do not constitute a per se conflict of interest, they certainly "raise suspicion among the public" and "reflect unfavorably upon the state and local governments." Accordingly, such actions should not be condoned.

## CONCLUSION

¶79.    The MississippiCAN contracts were unlawfully procured, executed, and implemented. As a result, the DOM's decision should be reversed, and the public contracts should be set aside and vacated.

**COLEMAN, J., JOINS THIS OPINION. MAXWELL AND CHAMBERLIN, JJ., JOIN THIS OPINION IN PART.**

32